393 A.2d 1097.

ALFRED J. PIMENTAL *vs.* PETER M. POSTOIAN *et al.*

NOVEMBER 8, 1978.

PRESENT: Bevilacqua, C.J., Joslin, Kelleher, Doris and Weisberger, JJ.

8

Doris, J. This is an appeal from the trial justice's unconditional grant of the defendant's motion for a new trial after the jury had returned a verdict for the plaintiff in this civil case alleging false arrest, assault, and battery. The jury assessed compensatory damages at $2,500 and punitive damages at $7,500. The trial justice concluded that the damages were excessive and granted the defendant's motion for a new trial. For the reasons stated herein we hold that the grant of the motion for a new trial was in error.

The record discloses that in February 1969, Alfred J. Pimental, plaintiff in the instant case, was charged with slapping one Edith Sullivan. Subsequently, Pimental was convicted in District Court of simple assault and fined $20. Pimental appealed his conviction to the Superior Court. Thereafter, but prior to the accrual of this cause of action, Edith Sullivan married defendant in the instant case, Peter M. Postoian, a trooper in the Rhode Island State Police.

In mid-November 1971, Postoian first learned of the slapping incident from his wife. On his own initiative he contacted the Middletown Police Department regarding the incident and was informed that a capias commanding the apprehension of Pimental[1] had been issued on November 5, 1971, by a justice of the Superior Court. Although he was then stationed in Chepachet, Postoian contacted the Registry of Motor Vehicles, obtained Pimental's home address in Tiverton and automobile license number, and noted this information on a pad that he carried with him in his patrol car.

---

[1]The record does not disclose the reason for the issuance of the capias.

On December 1, 1971, Postoian was reassigned to the Portsmouth barracks and directed to patrol the Tiverton area. That very evening, at approximately 2:30 a.m., he came upon Pimental's car parked in front of the latter's house near the bottom of a dead-end street. While parked in front of Pimental's house, Postoian contacted the Portsmouth State Police barracks to ascertain whether the capias remained outstanding for Pimental's arrest. A trooper at the barracks called the Middletown Police Department and was informed that the capias was still active. The capias's continued viability was verified by a teletype printout from the Bureau of Criminal Identification, a division of the Attorney General's Department. This information was relayed to Postoian. The uncontroverted fact is that this information was erroneous. The capias had actually been recalled by the issuing Superior Court justice on November 23, 1971, and the prosecution officer at the Middletown Police Department had returned the capias to the court on December 1, 1971, the afternoon before this incident. Because of an apparent oversight a copy of the capias had not been removed from the Middletown desk and a card in the police files indicated that the capias remained active. Unfortunately, this mistake was not discovered until several hours after the complained-of false arrest had been effected.

Confident that the capias was still in effect because of the information he had received from the Portsmouth barracks, Postoian requested and received the assistance of a fellow state policeman in order to effect Pimental's arrest. Pimental, who with his wife and two small children had been asleep in his house, was awakened by the two troopers' banging on his door at approximately 2:40 a.m. The troopers requested admittance; when refused, they broke down the door and followed Pimental into his bedroom where he was immediately arrested. Pimental testified that when he asked Postoian why he was being arrested, the latter replied, "This is for slapping my wife in the mouth." Postoian denied having made such a statement. Throughout the incident Pimental insisted that the capias had been cancelled and urged the

troopers to telephone the Tiverton Police Department to verify his contention. The troopers refused to place such a call and instead instructed Pimental to get dressed since he had to accompany them. Although he offered no physical resistance, Pimental refused to dress. Thereupon the troopers handcuffed him and took him out into the cold December night clothed only in jeans and a T-shirt. The testimony concerning exactly what transpired in Pimental's house was conflicting. The trial justice found as fact, however, that Postoian struck Pimental with a flashlight, grabbed him, and threw him against the wall.

The troopers transported Pimental to the Middletown police station. Upon his arrival Pimental immediately began insisting that the capias had been returned and the arrest was a mistake. The Middletown police only then ascertained that the capias had been returned to Superior Court the previous day. Pimental was then promptly returned to his house.

Pimental testified that his neck became sore as a result of being struck by Postoian and that he caught cold because he was inadequately clothed for the cold weather. There was, however, no evidence of medical bills or lost wages. Pimental further stated that he became emotionally upset at the time of the incident, continued to feel insecure, and feared the possibility of a similar arrest in the future.

Thereafter, plaintiff brought this action for false arrest, assault, and battery. After trial in Superior Court the jury returned a verdict for plaintiff, assessing $2,500 in compensatory damages and $7,500 in punitive damages. Subsequently defendant made a motion for a new trial. The trial justice unconditionally granted defendant's motion on the ground that the damages were so excessive as to indicate that the jury's verdict was motivated by sympathy, passion, and prejudice. The plaintiff has appealed.

No question is raised concerning defendant's liability. The only issue before us is whether the trial justice acted correctly when he granted defendant's motion for a new trial on grounds of excessive damages.

This court has frequently and carefully detailed the responsibilities of a trial justice in ruling on a motion for a new trial. Essentially, the trial justice must independently appraise the evidence in light of his charge to the jury and must pass on its weight and the credibility of the witnesses. *Puccio* v. *Diamond Hill Ski Area, Inc.*, 120 R.I. 28, 385 A.2d 650, 657 (1978); *Barbato* v. *Epstein*, 97 R.I. 191, 193, 196 A.2d 836, 837 (1964). Although the trial justice need not exhaustively evaluate the evidence, he must refer with sufficient specificity to the facts that prompted his decision to enable this court to determine whether his action was warranted or was instead predicated upon a misconception or oversight of material evidence or was otherwise clearly wrong. *Turgeon* v. *Davis*, 120 R.I. 586, 388 A.2d 1172, 1175 (1978); *Morinville* v. *Morinville*, 116 R.I. 507, 511-12, 359 A.2d 48, 51 (1976); *Wood* v. *Paolino*, 112 R.I. 753, 755-56, 315 A.2d 744, 745 (1974). As long as the trial justice follows this procedure and does not overlook or misconceive any material evidence, "his decision will be given great weight and will not be disturbed by us." *Tomasso* v. *DeMello*, 118 R.I. 470, 374 A.2d 784, 786 (1977).

The relation of the charge to the jury to the trial justice's consideration of a motion for a new trial is well settled in this jurisdiction. We have stated:

> "Our rule is that instructions given to a jury, absent an exception being taken or a request being made to charge differently, become the law of the case and we require a trial justice when he considers a motion for a new trial to follow the law he gave in his charge as scrupulously as the jury were bound to do in their deliberations. * * * the only question open for a trial justice's consideration on a motion for a new trial on the ground that the verdict is contrary to the law is whether the jury accepted and followed the law as stated in the charge. [citations omitted.] That rule applies regardless of whether the instructions were right or wrong." *Roland Bileau Transportation Co.* v. *Lodie Brien, Inc.*, 100 R.I. 723, 727, 219 A.2d 401, 403 (1966).

*Accord, Brunswick Corp.* v. *Sposato,* 120 R.I. 673, 389 A.2d 1251, 1252-53 (1978); *Powless* v. *Pawtucket Screw Co.,* 116 R.I. 158, 160, 352 A.2d 643, 645 (1976).

In his charge to the jury regarding compensatory damages the trial justice noted that the elements to be considered were mental and physical pain, suffering and anguish, great humiliation, shame and disgrace. He stated:

> "We don't have here, medical bills or hospital bills or lost wages. You'll take the evidence as you find it, and you take the nature of the damages, so-called, that have been claimed here, and you take them to the extent you think they're proven by a fair preponderance of the evidence and you consider that evidence fairly and justly and put a dollar sign on it which will fairly and adequately compensate him for those damages, compensatory damages."

The defendant did not object to this portion of the charge and accordingly it became the law of the case. In his decision on the motion for a new trial the trial justice found as fact that plaintiff suffered a sore neck, caught a cold, became nervous and upset, and undoubtedly was humiliated. Nevertheless, he ruled that there was "[n]o indication of any real damages which could be considered payable as compensatory damages." This ruling was at variance not only with his charge to the jury but also with the facts he found.

Although assessing compensatory damages is initially in the province of the jury, a new trial on the issue of damages may be ordered if the trial justice determines in his independent judgment that the award is so excessive in comparison to the injuries sustained as to fail to work substantial justice between the parties. *Wood* v. *Paolino, supra* at 756-57, 315 A.2d at 746; *DiBattista* v. *Lincoln,* 109 R.I. 412, 413, 286 A.2d 591, 592 (1972). We have repeatedly indicated, however, that there is no formula for computing damages to be awarded for pain and suffering with mathematical precision. *Fusaro* v. *Naccarato,* 103 R.I. 324, 326, 237 A.2d 545, 546 (1968). Our policy is to permit the jury substantial latitude in

such an award and to vacate that award only if it either is so grossly excessive as to shock the conscience or it clearly demonstrates that the jury was influenced by passion or prejudice or that in arriving at its award the jury proceeded upon a clearly erroneous basis. *Wood* v. *Paolino, supra* at 756-57, 315 A.2d at 746; *Ruggieri* v. *Beauregard,* 110 R.I. 197, 201, 291 A.2d 413, 415 (1972). Based on the law of this case, that the jury could compensate plaintiff for pain and suffering, the trial justice has demonstrated no disparity which shocks the conscience between the injury suffered by plaintiff and the amount awarded by the jury. We conclude that the trial justice was in error when he found there was no evidence to support the jury's award of compensatory damages.

The trial justice properly instructed the jury that punitive damages could be awarded, in their discretion, if they found defendant acted with actual malice or in such a reckless or wanton manner as to amount to malice. *See Petrone* v. *Davis,* 118 R.I. 261, 267, 373 A.2d 485, 488 (1977); *Herreshoff* v. *Tripp,* 15 R.I. 92, 94, 23 A. 104, 105 (1885). He further instructed:

> "If you find that he was acting in good faith and was proceeding with an intent only to enforce the law under the capias that he reasonably believed to be valid * * * *then you may consider that* in connection with your determination of whether the plaintiff is entitled to punitive damages or not." (Emphasis added.)

Thus, defendant's good faith reliance on the capias was only one factor to be considered in the jury's determination of whether or not defendant acted with malice. This instruction, which was substantially identical to that requested by defendant, became the law of the case for purposes of this appeal.[2] In reviewing the evidence on the motion for a new trial the trial justice found that defendant was motivated by

---

[2]In the light of this instruction we need not consider the effect of Super. Crim. P. 4(c)(3) and cases which have held that service of process facially valid would insulate the officer from liability.

a desire to arrest the person who had slapped his wife. He conceded that defendant was not on a routine patrol at the time of the incident: "He was down a dead end street and he went down there at two o'clock in the morning to grab this fellow, no question." Yet, he found that there was no malice because defendant had a good faith belief that he was proceeding under a valid capias.

As we have already indicated, the jury was *not* instructed that as a matter of law a police officer who acts under good faith and reasonable belief that he is justified in effecting an arrest cannot be found to have acted with malice. Once the trial justice determined that the case was a proper one for an award of punitive damages, whether the plaintiff was entitled to such an award was a matter left to the discretion of the jury. *Sherman* v. *McDermott*, 114 R.I. 107, 108, 239 A.2d 195, 196 (1974); *Kenyon* v. *Cameron*, 17 R.I. 122, 125, 20 A. 233, 234 (1890). Applying the law as given them in the charge, the jurors must have inferred that the defendent's actions were prompted by malice and they may have decided that an award of punitive damages would serve to deter the defendant from similar conduct in the future. *See Holmes* v. *Bateson*, 434 F. Supp. 1365, 1389-90 (D.R.I. 1977); *Norel* v. *Grochowski*, 51 R.I. 375, 377, 155 A. 357, 358 (1931). In so finding they did not stray from the law of the case.

Accordingly, the plaintiff's appeal is sustained, the judgment of the Superior Court granting the defendant a new trial is reversed, and the case is remanded to the Superior Court with instructions to reinstate the jury verdict in favor of the plaintiff.

*Charles J. Rogers, Jr.,* for plaintiff.

*Julius C. Michaelson,* Attorney General, *William Granfield Brody,* Special Assistant Attorney General, for defendant.