Ronald BORDEN, et al.,
Plaintiffs, Appellants,

v.

The PAUL REVERE LIFE
INSURANCE COMPANY,
Defendant, Appellee.

Ronald BORDEN, et al.,
Plaintiffs, Appellees,

v.

The PAUL REVERE LIFE
INSURANCE COMPANY,
Defendant, Appellant.

Nos. 90–2006, 90–2025.

United States Court of Appeals,
First Circuit.

Heard April 1, 1991.

Decided May 30, 1991.

Jeffrey S. Michaelson, with whom Julius C. Michaelson and Michaelson & Michaelson were on brief, for plaintiffs.

Jeffrey C. Schreck, with whom Flanders & Medeiros, Inc. was on brief, for defendant.

Before CAMPBELL, SELYA and CYR, Circuit Judges.

SELYA, Circuit Judge.

Invoking diversity jurisdiction, 28 U.S.C. § 1332, Ronald Borden (Borden) sued Paul Revere Life Insurance Company (Revere), a Massachusetts corporation, in Rhode Island's federal district court.[1] Revere counterclaimed. At trial, the jury found dupery all around and, with an assist from the judge, authored what might fairly be characterized as a split decision. After entry of judgment, both sides appealed. We believe the result is supportable and leave the parties where we found them.

## I. LISTEN, MY CHILDREN, AND YOU SHALL HEAR

While the bona fides of the original ride of Paul Revere, memorialized by Longfellow, have not seriously been questioned, the present protagonists bitterly dispute whether the corporate Paul Revere took Borden for a ride, or vice versa. We limn the facts, resolving occasional evidentiary conflicts in favor of the jury's verdict.

Borden, a thirtysomething Rhode Islander, moved to Florida in 1985. He organized a frozen lemonade business, Rainbow Frosty Cup, Inc. (Rainbow Frosty). The company was housed in a fairly primitive facility which contained no offices as such. It owned a fleet of vehicles, many of which were outfitted for the curbside sale of frozen lemonade at schools, ball games, and kindred venues. At any given time, Rainbow Frosty had a handful of employees, involved chiefly in mixing the lemonade, driving the good-humor trucks, and selling the product in the field. Borden ran the show, handling all phases of the operation: formulating strategy, doing the purchasing, overseeing production, supervising distribution, managing the finances, performing manual labor, serving as a jack-of-all-emergencies, and standing in for hired hands where needed.

On October 22, 1986, Gerald Terry, an independent broker, successfully solicited

---

1. Ronald Borden's wife, Linda, also sued, claiming loss of consortium. The jury found for the defendant on that claim—a finding not challenged on appeal. Hence, we doubt that Linda, although named in the Bordens' notice of appeal, is a proper party appellant. We do not probe the point, however, for whatever rights Linda might still enjoy would necessarily be dependent on, and limited by, Ronald's rights. Thus, our opinion proceeds as if Ronald were the sole plaintiff.

Borden's purchase of a disability insurance policy, to be underwritten by Revere. The transaction was contingent on Revere's approval. Terry filled out an application based on information supplied verbally by Borden during a question-and-answer session at Rainbow Frosty's premises. Borden signed the completed form. It described Borden's duties in the vaguest of generalities ("Operate retail and wholesale frozen lemonade, management & supervision"), but stated that ninety percent of his work-related activities were supervisory in nature. In response to the application's meticulously detailed section regarding medical history, Borden reported only a mild ankle sprain, suffered three years previously, from which he had fully recovered.

The underwriting protocol which Revere used for policies of this sort involved slotting an insured into a particular class based in considerable part on the insured's occupation and duties. When Borden's application was received at Revere's home office, Joan Megarry, an underwriter, responding primarily to Borden's status as business owner, the amorphous description of his job duties, and his "ninety percent supervisory" role at Rainbow Frosty, classified Borden's application "2–A." Megarry did not order a personal history interview to supplement the application, even though computer analysis indicated that, under Revere's internal operating procedures, such an interview was warranted. A standard 2–A policy was issued retroactive to October 12, 1986. The monthly premium was $116.92; the benefit period ran through age 65; and the benefit amount was $1400 per month, with a social security supplement in the event of total disability.

Borden paid his premiums regularly. On July 26, 1987, he injured his back while unloading a heavy bag of sugar from a storage truck at Rainbow Frosty. He promptly filed a claim for disability benefits. On the claim form, he described his occupation as "Owner—Operator" and listed his duties as "Loading—unloading sup-

plies—mixing and lifting stainless steel buckets containing product, ordering, driving—All phases of operation." When Borden's claim was scrutinized at Revere's home office, the reviewer noticed that the job description seemed much more "physical" than the policy application led one to believe. A Revere field agent, William Cooper, was dispatched to Florida. In the meantime, as monthly progress reports were received and reviewed (the plaintiff and his physician being obliged to sign and submit same), Revere would forward each month's benefit check. A seven to ten day lag time was customary.

Based on what Borden told him during the ensuing interview, Cooper prepared a written description of Borden's true duties at Rainbow Frosty—duties which included a steady diet of heavy lifting and other operose tasks. After perusing Cooper's report, Revere concluded that Borden had grossly overstated the executive aspects of his work on his original application, thereby triggering issuance of the "wrong" policy. Consequently, Revere decided to replace the 2–A policy with an A policy.[2] Its decision was entirely unilateral; rather than notifying Borden immediately of its proposed course of action, Revere simply withheld benefit payments until an agent could conveniently visit him.

On March 22, 1988, a Revere representative, Richard Boutilier, called unannounced on Borden (who by then had returned to Rhode Island). Boutilier's mission was to get the insured to sign a new application, backdated to the time of the original application, so as to support the planned policy switch. The new application was to have a different, more accurate, description of Borden's duties, conforming to the company's prototype for an A policy. Boutilier told Borden that the original policy should not have been issued and that a substitution was going to be made. Boutilier completed the new application at Borden's home and in Borden's presence, but with-

2. Under the company's guidelines, the "A" classification more accurately reflected the appreciable manual labor that Borden's occupation entailed. As compared to the 2–A policy, the A policy had a shorter benefit period (five years) and bore a higher monthly premium ($130.63). The monthly disability stipend was the same.

out Borden's participation, copying much of the first application but changing the job description. The new application listed Borden's occupation as "Business Owner" and his responsibilities as "Mixing lemonade, delivering, filling in for employees on all jobs." There was no percentage breakdown between white-collar and blue-collar tasks. According to Borden, the neoteric description understated his management duties and he told Boutilier as much. When Borden complained that his current payment was overdue, Boutilier came to the rescue, arranging on the spot and with considerable flourish for the check to be sent. Boutilier also waived filing of the next month's progress report.

Although Borden signed the new application, he refused to surrender the original policy. Boutilier left the meeting realizing that Borden was not completely sold on the policy swap. Undeterred, Boutilier delivered the replacement policy that summer. Borden was unhappy. Beginning in September 1988, he made numerous complaints to Revere about the policy substitution and recurrent delays in payment. Beginning in February 1989, Revere insisted that Borden fill out new, more intrusive, monthly progress reports as a condition to receiving benefits. This proved to be the last straw. Borden filed suit against Revere on March 8, 1989.

## II. THE SUIT

In his complaint, the plaintiff claimed that Revere committed fraud, acted in bad faith, invaded his privacy, and intentionally inflicted emotional distress. The defendant denied the charges. Discovery began. Early in 1990, Revere learned for the first time that Borden had experienced, and received medical care for, chronic back problems, not previously disclosed. Eventually, Revere documented that Borden suffered from myriad back, neck and head injuries between 1980 and 1984; that he was disabled for some months; and that he had received disability payments from another insurer on that account. The defendant stopped paying benefits. Borden amended his complaint. Revere counterclaimed, alleging misrepresentation and seeking a

ruling that both the original and replacement policies were void. Borden then added a breach of contract claim and some new bad faith claims.

The case was tried to a jury. At the close of the evidence, the court instructed the jury on various liability issues, reserving the question of damages. In respect to Borden's amended complaint, the jury answered certain special questions as follows:

1. Did the defendant defraud Mr. Borden by substituting the Replacement Policy for the Original Policy?

Answer: Yes.

2. [D]o you find Paul Revere breached its contract in stopping benefit payments to the plaintiff Borden?

Answer: No.

3. Is the defendant guilty of a bad faith refusal to pay Mr. Borden or to timely perform its obligations under the insurance policy?

Answer: No.

4. Is the defendant guilty of intentionally inflicting emotional distress on the [plaintiff]?

Answer: Yes.

5. [D]id the defendant's conduct cause Mrs. Borden to suffer a loss of consortium?

Answer: No.

6. Was Mr. Borden's privacy invaded?

Answer: No.

Although Borden testified, *inter alia*, that he had severe memory problems and did not remember much of his medical history, the jurors' collective memory was vivid; in respect to Revere's counterclaim, they answered a special interrogatory as follows:

[7]. Did Mr. Borden fail to disclose certain significant facts to Paul Revere at the time the application for the Original Policy was submitted, which facts were material to its decision regarding Mr. Borden's application?

Answer: Yes.

After these answers were announced, the jury was released subject to recall. The judge noted that the answers might be inconsistent, but did nothing further at the

time. In a letter to counsel a few days later, he ruled that, in light of the answer to what we have termed Question No. 7, he would declare the policies void. He also directed that the jury be reassembled to fix damages on Borden's emotional distress claim (Question No. 4) but not on the fraud claim (Question No. 1). The judge reasoned that, given rescission of the policies, the fraud was not compensable.

Approximately a week later, the jurors were reassembled. After further instructions and deliberation, they awarded the plaintiff $15,400 in compensatory damages and $42,000 in punitive damages. The court entered judgment for these amounts, simultaneously entering judgment for Revere on all remaining counts and on the counterclaim.

There are a golconda of issues presented on appeal. One way or another, the parties are challenging virtually all aspects of the judgment below, save only the disposition of the privacy and consortium claims. We first address the seminal question of what law applies (Part III); then turn our attention to a trio of claims on which plaintiff spreads the alarm (Parts IV–VI); next confront defendant's jeremiad in respect to the intentional infliction count (Part VII); and end our particularized discussion by considering the parties' shared unhappiness over the mixed-bag resolution of Borden's fraud claim (Part VIII).

## III. CHOICE OF LAW

A federal court sitting in diversity jurisdiction must borrow the substantive law of the forum state. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938). It is by now axiomatic that the forum's choice-of-law tenets are part of the substantive law to be husbanded. *See, e.g., Day & Zimmermann, Inc. v. Challoner*, 423 U.S. 3, 4, 96 S.Ct. 167, 168, 46 L.Ed.2d 3 (1975); *Klaxon Co. v. Stentor Electric Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Where, however, the parties have agreed about what law governs, a federal court sitting in diversity is free, if it chooses, to forgo independent analysis and ac-

cept the parties' agreement. *See Moores v. Greenberg*, 834 F.2d 1105, 1107 n. 2 (1st Cir.1987); *In re Pioneer Ford Sales, Inc.*, 729 F.2d 27, 31 (1st Cir.1984).

We do so here. The parties, sometimes explicitly, other times through the natural implication of their asseverations, have achieved a satisfactory consensus on the critical choice-of-law issues. Borden, Revere, and the court below consistently cited Rhode Island law as controlling all Borden's claims. As for Revere's counterclaim, both sides argued to the district court that Massachusetts law governed. The court apparently acquiesced. Although Revere now beseeches us that Florida law should prevail in connection with the counterclaim, the afterthought comes too late. In the absence of exceptional circumstances, not present here, a litigant is bound by a plausible choice of law which it successfully urged the trial court to follow. *See, e.g., Fashion House, Inc. v. K Mart Corp.*, 892 F.2d 1076, 1095 (1st Cir. 1989); *cf. Templeman v. Chris Craft Corp.*, 770 F.2d 245, 247 (1st Cir.) (litigants' failure to object to magistrate's use of maritime law precludes appellate review of newly emergent idea that Michigan law should apply), *cert. denied*, 474 U.S. 1021, 106 S.Ct. 571, 88 L.Ed.2d 556 (1985).

## IV. THE COUNTERCLAIM

We begin our odyssey through village and farm by visiting the counterclaim. We think it is important first to put the plaintiff's grounds of appeal into perspective. The jury found that, in applying for disability insurance, Borden misrepresented material facts anent his medical history. The plaintiff accepts the inviolability of that finding but argues, nonetheless, that the remedies granted (rescission of the policies and recoupment of benefits paid under them, offset against premiums retained) were improvidently bestowed because (1) the counterclaim was stale, and (2) regardless of temporal deficiencies, the district court misapprehended the consequences of the finding.

## A.
### Timeliness

■ The plaintiff moved for an instructed verdict on Revere's counterclaim, asserting that it was time-barred under Mass. Gen.L. ch. 260, § 2A ("actions of tort" and certain "contract" actions must be commenced within three years from the time "the cause of action accrues"). The district court reserved decision on the motion and ultimately denied it, Fed.R.Civ.P. 50(b), finding adequate evidence that the limitation period did not begin to run until after suit was started.[3] Assuming *arguendo* that this statute applies, the district court was correct.

In Massachusetts, as elsewhere, "[i]t is established that misrepresentation claims may be subject to the discovery rule." *Hanson Housing Auth. v. Dryvit System, Inc.*, 29 Mass.App.Ct. 440, 560 N.E.2d 1290, 1293 (1990), *rev. denied,* 409 Mass. 1101, 565 N.E.2d 792 (1991). Under that rule, a cause of action in either contract or tort which "is based on an inherently unknowable wrong" accrues, for limitation purposes, "when the injured person knows or in the exercise of reasonable diligence should know of the facts giving rise to the cause of action." *Dinsky v. Framingham,* 386 Mass. 801, 438 N.E.2d 51, 52 (1982). A wrong can be "inherently unknowable" if it is "incapable of detection by the wronged party through the exercise of reasonable diligence." *International Mobiles Corp. v. Corroon & Black/Fairfield & Ellis,*

*Inc.,* 29 Mass.App.Ct. 215, 560 N.E.2d 122, 126 (1990); *see also Friedman v. Jablonski,* 371 Mass. 482, 358 N.E.2d 994, 996–97 (1976).[4] Ascertaining "reasonable diligence," like ascertaining "reasonable care," is ordinarily a fact-dominated enterprise. So here.

In the case at bar, the jury could well have found that Revere exercised reasonable diligence when scrutinizing the results of Borden's medical questionnaire. The completed form did not mention, or even hint at, Borden's serious back problems. An insurance company cannot routinely be expected to prove a negative, that is, to verify the undisclosed medical history of every applicant. Here, Revere had no cause to suspect that, in answering the questionnaire, Borden was whitewashing his past. At least until Borden sued, Revere had no overwhelming incentive to go behind his unequivocal representations about the state of his health. Inasmuch as Borden docketed his complaint on March 8, 1989, and the counterclaim was filed well within three years of that date, there was a jury question as to whether the defendant "could ... have reasonably known" of the misrepresentation at a substantially earlier date. *Dinsky,* 438 N.E.2d at 52. The plaintiff's motion was properly denied.[5]

## B.
### The Rescissory Remedy

The plaintiff's challenge to the order for rescission has twin foci. He argues, first,

---

**3.** This result was completely consistent with the incontestability provision in the insurance policies—a provision which states that representations in the application cannot be contested after a policy has been in effect for two years, measured without reference to any period when the insured is disabled. Here, Borden became disabled less than a year after coverage attached. The incontestability period, therefore, had not yet dawned when the counterclaim was docketed.

**4.** A wrong can also be inherently unknowable if the party wronged was a victim of fraudulent concealment so long as the fraudulent concealment was explicit; silence will not constitute fraudulent concealment under Massachusetts law unless the actors are linked by a fiduciary relationship. *See Hanson Housing Auth.,* 560 N.E.2d at 1293.

**5.** The Court's refusal to grant Borden's motion for a directed verdict on this ground did not necessarily foreclose all pursuit of the affirmative defense. The plaintiff, had he so elected, could have argued the question of reasonable diligence to the jury, under proper instructions from the judge. *See Riley v. Presnell,* 409 Mass. 239, 565 N.E.2d 780, 786–87 (1991) (where there is a factual dispute concerning when a plaintiff knew or should have known of his cause of action, the jury is the proper arbiter of the dispute). Here, the record indicates that plaintiff eschewed this bite at the apple, arguing below, as he has done before us, his entitlement to the defense as a matter of law, and nothing more.

that rescission was inappropriate because Revere's tortious behavior rendered it ineligible to enjoy the equitable remedy of rescission; and second, that the replacement policy, at least, could not be annulled because the alleged misrepresentations occurred only on the occasion of the plaintiff's initial application. Neither focus is sharp.

■■■ 1. *Availability of Remedy.* It is settled that an insurance policy may be rescinded if an applicant makes material misrepresentations, that is, false or incomplete statements "related to a matter the truth as to which, as compared with the representation, increased the risk of loss." *See Davidson v. Massachusetts Casualty Ins. Co.*, 325 Mass. 115, 89 N.E.2d 201, 203 (1949); *Ayers v. Massachusetts Blue Cross, Inc.*, 4 Mass.App.Ct. 530, 352 N.E.2d 218, 222 (1976). Ordinarily, the question of whether misstatements escalate the risk is factbound. In this case the jury, properly instructed on materiality, resolved the misrepresentation issue against the plaintiff. Given this fully supportable finding, it was well within the district court's equitable power to void the policies.

The question remains, of course, whether the power should have been exercised. Borden contends that the jury's fraud finding (Question No. 1) tarred Revere with as grimy a brush, rendering rescission inappropriate. But fashioning or withholding equitable relief, taking into account special circumstances like a defendant's soiled hands, rests uniquely within the discretion of the trial court. *See Weinberger v. Romero–Barcelo*, 456 U.S. 305, 320, 102 S.Ct. 1798, 1807, 72 L.Ed.2d 91 (1982) (proper standard for appellate review of equitable relief is "whether the District Court abused its discretion"); *Coggins v. New England Patriots Football Club, Inc.*, 397 Mass. 525, 492 N.E.2d 1112, 1119 (1986) (similar). Such an approach "acknowledg[es] that the trial judge, who has had first-hand exposure to the litigants and the evidence, is in a considerably better position to bring the scales into balance than an appellate tribunal." *Rosario–Torres v. Hernandez–Colon*, 889 F.2d 314, 323 (1st Cir.1989) (en banc). The broad discretion conferred on the trier liberates the nisi prius court from the dominion of absolutes, allowing it to weigh the equities, evaluate competing wrongs, and determine which party, if either, is more deserving of equitable relief. *See, e.g., Norton Co. v. Carborundum Co.*, 530 F.2d 435, 442 (1st Cir. 1976) ("A court thus free to use its equitable powers to punish wrongful behavior, has equally wide discretion to withhold punishment of behavior which it considers not to warrant so severe a sanction."); *Fisher v. Fisher*, 349 Mass. 675, 212 N.E.2d 222, 224 (1965) (clean hands doctrine is not one of absolutes, but is to be applied to promote its purpose of preventing a party from benefiting by his dishonesty).

These principles are dispositive here. Revere presented uncontradicted evidence that, had it known of Borden's aching back, it would not have issued either disability policy. In light of the jury's finding that the plaintiff materially misrepresented his medical condition, the centrality of those misrepresentations to the issuance of the policies, and the fact that Revere's misconduct related to a peripheral matter (the policy swap) which turned out, in the long run, to have no contractual consequences, *see infra* Part VIII(B), we will not disturb the district court's conclusion that a rescissory remedy was warranted. *See Rosario–Torres*, 889 F.2d at 323 (when district court grants or withholds equitable remedy, reversal requires "a meaningful error in judgment") (citation omitted).

■■■ 2. *Extent of Remedy.* The plaintiff also declares that, even if rescission were warranted, the court below erred in rescinding the replacement policy. He tells us that no misrepresentations were made to, or relied on by, Revere in that wise; the application for the second policy was obtained by fraud and contained no representations concerning his medical history; and Revere could not possibly have relied on it because, by the time Boutilier met with Borden and obtained the new application, Revere's underwriting decisions had already been set in cement.

These pererrations go nowhere. Statements made in an insurance application constitute continuing representations. *See Ayers*, 352 N.E.2d at 222. The plaintiff's representations anent his health were still current when the replacement policy was delivered. Consequently, in the absence of a significant intervening event excusing disclosure (say, the dawning of the incontestability period), the material misrepresentations as to medical history on the first application, in circumstances where Borden was chargeable with knowledge of the truth, warranted rescission not only of the original policy but also of the replacement policy. *Cf., e.g., Stipcich v. Metropolitan Life Ins. Co.*, 277 U.S. 311, 316–18, 48 S.Ct. 512, 513–14, 72 L.Ed. 895 (1928) (if at any time before a policy issues, the insured knows facts which make portions of his application untrue, and does not make full disclosure, the company will have a right to rescind the policy); *Mutual Life Ins. Co. v. Bohlman*, 328 F.2d 289, 293 (10th Cir.1964) (similar).

In sum, the evidence supported rescission of both the original policy and the replacement policy, based on the material misrepresentations contained in the original application—an application which was knowingly false and which the insured, in respect to medical history, made no effort to correct or amplify at any time.

## V. BAD FAITH

 Borden charged Revere with statutory bad faith in four respects:[6] Revere did not pay benefits on time, forced him to use the new, more onerous reporting form, fraudulently manipulated a policy exchange, and eventually stopped benefit payments altogether. Borden also asserted bad faith claims (statutory and common law) based on Revere's purported misuse of medical authorizations which he delivered as a condition to receiving his benefits. He alleged that the authorizations were transmitted so that Revere could confirm disability, but that the insurer used them to gather information about Borden's checkered medical past. These animadversions were all commingled, without objection, and sent to the jury in a single question on the verdict sheet (Question No. 3). The jury answered the question in the negative.

Borden harangues the jury's decision on two grounds, contending that (1) the verdict sheet was inadequate because it did not provide a niche for common law bad faith; and (2) the evidence, as a matter of law, required that he prevail on his statutory bad faith claim. We are not convinced.

Borden concedes that the jury was adequately instructed on common law bad faith. His complaint is merely that the verdict sheet did not provide the jury with a convenient spot to find for him on the claim. This argument is jejune. For one thing, Question No. 3 was broad enough to embrace Borden's statutory and common law theories in their entirety. For another thing, we think it is clear that Rhode Island's enactment of a statutory cause of action for insurer bad faith codified, and thus supplanted, the common law action. *See Pace v. Insurance Co. of North America*, 838 F.2d 572, 578 (1st Cir.1988); *Rumford Prop. and Liab. Ins. Co. v. Carbone*, 590 A.2d 398, 400 (R.I.1991). Should more be needed, the sockdolager is that Borden did not object either to the final charge[7] or to the "omission" of a further, more particularized question "before the jury retire[d]," Fed.R.Civ.P. 49(a), and thus, waived any right to merchandise the wares which he now attempts to hawk. *See, e.g.,*

---

**6.** The statutory claims invoked R.I.Gen.Laws § 9–1–33 (1985), which reads in relevant part: [A]n insured under any insurance policy ... may bring an action against the insurer issuing said policy, when it is alleged said insurer wrongfully and in bad faith refused to pay or settle a claim made pursuant to the provisions of said policy, or otherwise wrongfully and in bad faith refused to timely perform its obligations under said contract of insurance.

**7.** Borden objected to the initial charge, and asked for additional instructions to be given on common law bad faith. The judge obliged the request. Borden made no further objection. He has, therefore, waived any right to complain on appeal about this segment of the jury charge. *See Clancy v. Brunswick–Balke–Collender Co.*, 291 F.2d 799, 806 (3d Cir.1961).

*Phav v. Trueblood, Inc.*, 915 F.2d 764, 769 (1st Cir.1990) (where defendant "did not ... raise any objection to the jury instructions or special questions after the charge," defendant waived its right to object later); *Anderson v. Cryovac, Inc.*, 862 F.2d 910, 918 (1st Cir.1988) ("It is well settled that a litigant who accedes to the form of a special interrogatory will not be heard to complain after the fact.").

Borden's remaining exhortation—that a reasonable jury could only have found bad faith—hinges on his argument that the finding of fraud established bad faith as a matter of law. The hinge is rusted. The fraud claim required that the jury determine that "the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted upon it to his damage." *Barrett Assoc., Inc. v. Aronson*, 346 Mass. 150, 190 N.E.2d 867, 868 (1963) (citations omitted); *accord McGovern v. Crossley*, 477 A.2d 101, 103 (R.I.1984). While an insurer's fraud may be a predicate for a first-party insurance bad faith claim, the latter claim requires proof of at least one further fact: that the coverage or benefits in question were owed. Where, as here, the policies were voided due to the insured's misrepresentations, so that there would have been no contractual liability even if the insurer had exercised the utmost good faith, liability does not lie under R.I.Gen.Laws § 9–1–33. *See Gleason v. Merchants Mutual Ins. Co.*, 589 F.Supp. 1474, 1477 (D.R.I.1984); *Rumford, supra,* 590 A.2d at 400; *Bartlett v. John Hancock Mut. Life Ins. Co.*, 538 A.2d 997, 1000 (R.I.1988).

## VI. BREACH OF CONTRACT

 The plaintiff does not criticize the lower court's evidentiary rulings or jury instructions in connection with his breach of contract claim, but argues instead that he should have received a directed verdict because the defendant's conduct comprised a breach as a matter of law. Our review of such an assertion is very limited: "we must examine the evidence and the inferences reasonably to be drawn therefrom in the light most favorable to the [verdict winner]" in order to see if "reasonable persons could reach but one conclusion." *Wagenmann v. Adams*, 829 F.2d 196, 200 (1st Cir.1987). In so doing, "we may not consider the credibility of witnesses, resolve conflicts in testimony, or evaluate the weight of the evidence." *Id.*

Recognizing the difficulty of his position on the merits, Borden takes a back-door approach to the issue. He argues that Revere was required to (and did not) return Borden's premiums as a condition of rescinding the contract. Ergo, the rescission was ineffective and Revere was in breach. We disagree.

To be sure, the general rule is that when an insurer ventures to rescind a policy on the basis of a material misrepresentation in the application, it must first tender to the insured the premiums paid under the policy. *See 6 Couch on Insurance 2d* § 34.35, at 892 (1985). The function of rescission, after all, is to restore the status quo ante—a feat which will customarily involve returning the consideration originally paid. But the rule—like most rules—is not without its exceptions. We think it is good law that, when an insurer has paid a claim to an insured under a policy which is subsequently rescinded by reason of the insured's knowingly false application, and the monies paid are in excess of the premiums received, the insurer has a right of offset; hence, return of the premium is not a condition precedent to rescission. *Accord American Standard Ins. Co. v. Durham*, 403 N.E.2d 879, 881 (Ind.Ct.App. 1980); *Mincho v. Bankers' Life Ins. Co.*, 129 A.D. 332, 113 N.Y.S. 346, 348 (1908); *see also 6 Couch on Insurance 2d, supra,* at 892–93; 3A J. Appleman, *Insurance Law & Practice* § 1832 (1979); 2 *Black on Rescission* § 483, at 1219–20 (1929). A contrary rule—requiring an insurer which has already overpaid a scalawag insured to throw good money after bad in order to set aside a policy obtained by the insured's deceit—would make no sense.

At the time Revere ventured to pull the plug on the policy, it had paid much more

in benefits (close to $65,000) than it had received in premiums (less than $1,500). Accordingly, the defendant's refusal to remit the premiums did not place it in breach.

## VII. INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

We turn now to the defendant's grounds of appeal. Revere calumnizes the district court's failure to direct a verdict concerning the claim for intentional infliction of emotional distress. It also contests the award of punitive damages.

### A.

### *Liability*

■ Rhode Island has recognized a cause of action for intentional infliction of emotional distress patterned after Restatement (Second) Torts § 46 (1965). *See Champlin v. Washington Trust Co.*, 478 A.2d 985, 988 (R.I.1984). To make out the tort, a plaintiff must show that the defendant's conduct was (1) intentional or in reckless disregard of the probability of causing emotional distress; (2) extreme and outrageous; and (3) a proximate cause of the emotional distress. *See id.* at 989. There must also be evidence that the emotional distress was severe, *id.*, a requirement which in Rhode Island means that the psychic trauma must have some physical manifestation. *See Reilly v. United States*, 547 A.2d 894, 898–99 (R.I.1988). Revere urges that no rational juror could find that its behavior, albeit intentional, was extreme and outrageous, or that the plaintiff's emotional distress was accompanied by significant physical ills.

■ 1. *Outrageous!* There is no universal litmus test that a court can utilize to determine whether behavior is extreme and outrageous. Virtually by definition, "outrage" is a fact-specific phenomenon. The conventional tests are stringent (although not so stringent as the hyperbole in which they are sometimes couched might suggest). In general, liability is imposed only where

the case is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, "Outrageous!"

Restatement (Second) of Torts § 46, comment (d). This case falls reasonably close to the line. Yet, taking the evidence in the light most favorable to the verdict winner, *see Wagenmann*, 829 F.2d at 200, we believe that the jury could plausibly have found the following facts:

a. Apart from Borden's medical history (not then revealed), Revere did not make a rectifiable mistake in issuing the original policy but issued it through its own carelessness or sloth. Having no entitlement to downgrade the policy, Revere nonetheless undertook to convince Borden in 1988 that it had a "right" to interchange the policies.

b. Revere's actions in switching the policies and in delaying benefit payments to facilitate the exchange were unconscionable, considering that: Boutilier went unannounced to Borden's residence; no written notice of Revere's decision to switch policies was sent beforehand; Boutilier backdated the second application; Boutilier insisted upon inserting an overly one-sided job description; and, critically, Revere withheld payment of Borden's benefits pending Boutilier's success.

c. During his meeting with Borden, Boutilier lied, describing the proposed replacement policy as "better" than the original policy.

d. Borden, for his part, was uneasy with the switch, but felt pressured by his need to receive ongoing benefit payments. Boutilier's accomplishments bespoke his clout with the company,[8] and Borden could reasonably have believed, based on Boutilier's conduct, that if he, Borden, did not sign the new application, his benefit checks would be further delayed.

Whether the actions of a defendant "go beyond [the] bounds of decency" so as "to

---

**8.** He was, for instance, able to make an overdue benefit check materialize and to waive a

progress report requirement, *see supra* p. 374.

be regarded as atrocious," Restatement (Second) of Torts § 46, comment (d), will ordinarily be a function of three factors—the behavior itself; the relationship between the parties; and the known (or knowable) susceptibility of the victim. Here, the first factor was arguably marginal. The second and third factors, however, weighed heavily in the plaintiff's favor. The relationship between the protagonists—first-party insurer to disabled insured—was inherently protective in nature. It was possible to conclude that Borden was frightened and in need of funds. In the end, a rational jury could well have thought that a large, moneyed corporation preyed mercilessly on a disabled individual's physical and mental condition by withholding and delaying benefit payments and by lying to him, in order to coerce him into surrendering his insurance coverage through age 65 and accepting an inferior replacement policy. That being so, the requisite "threshold of conduct," *Elias v. Youngken*, 493 A.2d 158, 164 (R.I.1985), was crossed. The question, as the district court ruled, was for the jury.

■ 2. *Physical Manifestations.* We need not tarry over the remaining aspect of the defendant's challenge. There was evidence in the record that the plaintiff suffered two migraine headache attacks requiring hospitalization. There was also testimony from which the jury could have found that these attacks, and their sequelae, resulted from Revere's actions in switching the policies, dragging out payments, and harassing Borden in various ways. While the evidence was far from compelling, it sufficed to establish physical injury of a sort sufficient to skirt the directed verdict barrier.

### B.

### *Punitive Damages*

■ The defendant also claims that the evidence was too exiguous to justify an award of punitive damages. Revere's claim touches upon an intriguing question: the nexus between the requisite findings undergirding an intentional infliction claim and the findings necessary to allow an

award of punitive damages under such a claim.

In Rhode Island, the standard for imposing punitive damages is rigorous: "one seeking punitive damages must produce 'evidence of such willfulness, recklessness or wickedness, on the part of the party at fault, as amount[s] to criminality, which for the good of society and warning to the individual, ought to be punished.'" *Morin v. Aetna Casualty and Surety Co.*, 478 A.2d 964, 967 (R.I.1984), *quoting Sherman v. McDermott*, 114 R.I. 107, 329 A.2d 195, 196 (1974); *see also Izen v. Winoker*, 589 A.2d 824, 829–30 (R.I.1991). As strict as the standard may be, the standard for intentional infliction is even more onerous. To recover for the tort, "[i]t has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort." Restatement (Second) of Torts § 46, comment (d). A fortiori, a prevailing plaintiff in an intentional infliction case, at a bare minimum, will have proved conduct warranting punitive damages under other tort theories. The question then becomes whether punitive damages are, by definition, appropriate in *all* cases of intentional infliction of emotional distress, or if there is some special criterion which distinguishes those intentional infliction cases in which punitive damages are appropriate.

The reported Rhode Island opinions have not directly spoken to this issue. We look, therefore, to analogous decisions in other jurisdictions and whatever other reliable data can be found to aid us in vaticinating how the Rhode Island Supreme Court would probably view the question. *See, e.g., Kotler v. American Tobacco Co.*, 926 F.2d 1217, 1224 (1st Cir.1990); *Ryan v. Royal Ins. Co.*, 916 F.2d 731, 734–35 (1st Cir.1990); *Moores*, 834 F.2d at 1107.

Other courts that have analyzed the same problem have noted the similarity in the behavior necessary to make out the tort

of intentional infliction of emotional distress and the behavior required to justify punitive damages. *See, e.g., Crump v. P & C Food Mkts., Inc.,* 154 Vt. 284, 576 A.2d 441, 449 (1990); *Richardson v. Fairbanks North Star Borough,* 705 P.2d 454, 456 (Alaska 1985); *Sere v. Group Hospitalization, Inc.,* 443 A.2d 33, 37–38 (D.C.), *cert. denied,* 459 U.S. 912, 103 S.Ct. 221, 74 L.Ed.2d 176 (1982). In particular, these courts have noted that the extreme and outrageous behavior necessary to ground an intentional infliction claim is always sufficient to support a punitive damage claim. *E.g., Crump,* 576 A.2d at 449. It follows, then, that whenever a plaintiff succeeds on an intentional infliction claim, the trier can impose punitive damages. *See, e.g., Chuy v. Philadelphia Eagles Football Club,* 595 F.2d 1265, 1277 (3d Cir.1979) (en banc) (finding "no inconsistency in awarding punitive damages by the same legal standard used in determining liability for compensatory damages"); *Scheuer v. Wille,* 385 So.2d 1076, 1078 (Fla.Dist.Ct.App.1980) ("To state a cause of action for the intentional infliction of emotional distress a complaint must allege facts which, if proven, would also support an award of punitive damages."). *But see Knierim v. Izzo,* 22 Ill.2d 73, 174 N.E.2d 157, 165 (Ill.1961) ("Since the outrageous quality of the defendant's conduct forms the basis of the action, the rendition of compensatory damages will be sufficiently punitive."). We believe that Rhode Island would adopt the majority rule and hold that, when liability for intentional infliction has been satisfactorily established, a plaintiff must carry no additional burden to establish his eligibility for exemplary damages.

Eligibility should not be confused with entitlement. The decision as to whether or not punitives, though allowable, are actually to be imposed lies firmly within the discretion of the jury. *See, e.g., Crump,* 576 A.2d at 449; *see also Morin,* 478 A.2d at 967 (once court determines that the action is a proper one for award of punitive damages, plaintiff's entitlement to the

award is within jury's discretion); *Pimental v. Postoian,* 121 R.I. 6, 393 A.2d 1097, 1102 (1978) (same). Inasmuch as we discern no manifest misuse of the jury's discretion in this instance, the punitive damage impost cannot be disturbed. *See Dias v. Vieira,* 572 A.2d 877, 879 (R.I.1990) (once the proper foundation has been laid, the trier's discretion in awarding punitive damages is so great that the decision to grant or withhold them is virtually unreviewable).[9]

## VIII. FRAUD

Both parties assign error to the handling of the plaintiff's fraud claim. Revere says that the judge should have directed a verdict in its favor because the evidence was insufficient to show that Revere made false statements with the intention of deceiving Borden. Not to be outdone, Borden replies that the only error lay in not permitting the jury to assess damages for fraud.

### A.
### *One If By Land*

■ As previously mentioned, appellate review of the denial of a directed verdict is severely circumscribed. If reasonable minds could differ, then the issue was suitable for jury deliberation. In this instance, there was ample, if not compelling, evidence that Revere defrauded the plaintiff into signing the second application. One possible view of the evidence, for example, described in greater detail in Part VII(A)(1), *supra,* was that when a potentially expensive claim loomed on the horizon, Revere scrambled desperately to cover up for its mistake in issuing too generous a policy and euchred Borden into accepting a substitute policy which, though represented by Revere's agent as "better" than the original, was in fact much worse.

To be sure, there are several permissible views of the evidence on which Revere would not be guilty of fraud—but given a choice among various plausible alterna-

---

9. In its briefs, the defendant effectively concedes *sub silentio* that, if punitive damages could properly have been awarded, the amount set by the jury in this case cannot be second-guessed on appeal.

tives, one or more of which could sustain a liability finding, the jury was the appropriate arbiter of the fraud count.

### B.
### *Two If By Sea*

 Not surprisingly, Borden stands on the opposite shore. He pronounces himself content with the answer to Question No. 1, objecting only to the court's refusal to take the next step and ask the jury to assess damages. Borden insists that the fraud claim can survive on its own terms, independent of the rescission of the insurance policies. We agree. In this sense, then, the fraud claim is different from the bad faith claims, because the fraud claim does not necessarily depend upon the existence of a contractual duty. Yet this distinction, without more, does not entitle Borden to incremental damages for fraud. We explain briefly.

Viewed most favorably to the plaintiff, Revere's fraud induced him to accept the replacement policy in lieu of his original policy. Had the policies been valid and enforceable, he would have been harmed, for the new policy was inferior to the old. But, the policies were not valid and enforceable; due to Borden's misrepresentations anent his medical history, they were ultimately rescinded. Because Borden had no rights in the original policy, he suffered no cognizable loss as a result of the fraudulent switch. Accordingly, no compensable harm was occasioned. *See Powers v. Boston Cooper Corp.*, 926 F.2d 109, 111 (1st Cir.1991) (complaint that releasee defrauded releasor into signing release failed to state an actionable claim where release pertained to agreement that was, in any event, unenforceable). Here, as in *Powers*, the plaintiff lost nothing by succumbing to the fraud.

Borden's fallback position is that the emotional distress suffered in consequence of the fraud was itself compensable. The evidence, however, will not support a further recovery on this score. Borden was awarded full damages for intentional infliction of emotional distress. The only way that the jury could have imposed liability on that claim was to find that the insurer's behavior in regard to the policy switch was extreme and outrageous. This was, of course, the identical behavior which underlay the fraud count. A plaintiff's recovery against a defendant under one tort theory precludes any duplicative recovery for the same damages under some other tort theory. *See Diversified Graphics, Ltd. v. Groves*, 868 F.2d 293, 295 (8th Cir.1989) (duplicative recovery for the same underlying behavior is prohibited); *Atkinson v. Anadarko Bank & Trust Co.*, 808 F.2d 438, 441 (5th Cir.) (similar), *cert. denied*, 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 780 (1987); *Clark v. Taylor*, 710 F.2d 4, 8 (1st Cir.1983) ("the amount of compensatory damages properly awardable does not depend on the number of theories under which plaintiff may recover, but on the extent of his injury"); *Calimlim v. Foreign Car Center, Inc.*, 392 Mass. 228, 467 N.E.2d 443, 448 (1984) ("where the same acts cause the same injury under more than one theory ... duplicative damage recoveries will not be permitted"); *see also Reilly v. United States*, 863 F.2d 149, 163–65 (1st Cir.1988) (implying that Rhode Island law prohibits duplicative recoveries). Thus, Borden's recovery on the intentional infliction claim barred any incremental award of damages on the fraud claim.

The same principle abides for punitive damages. A representative case is *Digital & Analog Design Corp. v. North Supply Co.*, 44 Ohio St.3d 36, 540 N.E.2d 1358 (1989), where the court looked at whether multiple torts stemmed from the same animus to determine if punitive damages could be recovered on each. The court held that "in an action seeking punitive damages, the law should not countenance one to be punished repeatedly for the same act or allow multiple recoveries for such act." 540 N.E.2d at 1366. We think the Rhode Island Supreme Court would use a similar analysis.

In the instant case, Borden's intentional infliction of emotional distress claim encompassed the very behavior upon which Borden's fraud claim was predicated. Compensatory and punitive damages for

the tortious conduct were exacted under the intentional infliction count. Thus, there was no point in sending the fraud count to the jury on damages. If error was committed, it was benign. *See Clark,* 710 F.2d at 8; *cf. Kotler,* 926 F.2d at 1229 (no reversible error in withholding jury instruction which, if given, could not have affected the outcome).

## IX. THE END OF THE RIDE

We need go no further. Duplicity, like virtue, is sometimes its own reward. The record reflects that the parties received a pristine trial, unsullied by significant legal error, with a result that seems tolerably fair. Hence, we have no sufficient cause to intervene.

*The judgment of the district court is affirmed in all respects. All parties shall bear their own costs.*

CAMPBELL, Circuit Judge (Dubitante).

Judge Selya has written a most convincing and thoughtful opinion. I agree wholeheartedly with all aspects of it except I am troubled by one. I find it hard to accept that, as a matter of law, the evidence supports a ruling that Revere is liable to Borden for intentionally inflicting emotional distress upon him.

The support for this result, as recited by the court, rests in large measure upon Revere's excessive and ill-advised efforts (in light of what Revere then knew) to get Borden to accept a less valuable substitute policy in place of the one originally issued to him. Revere's actions took the form, among other things, of delaying payment of benefits due to Borden under the original policy, misrepresenting the merits of the successor policy, and insisting upon the company's right to force a substitution.

Had Borden held an unsullied right to the original policy, I would agree entirely with the court that Revere's conduct sufficed to support the jury's finding in Borden's favor on his claim for emotional distress. However, as Revere later discover-

ed, Borden had fraudulently concealed from the company his history of back trouble when he applied for the original policy. Because of his fraud, as we now hold, and the district court found, the company became entitled to cancel all of Borden's coverage. Given these unusual circumstances, the question arises whether Borden can properly be reimbursed for emotional distress caused largely by Revere's failure to have given him the full benefits of a policy to which he was not entitled.

It can be said in Borden's favor—as my colleagues point out—that Revere did not know about Borden's fraud when it used inappropriate pressure tactics to get him to switch to a less favorable successor policy. Thus if one puts on blinders, and refuses to consider the consequences of Borden's own dishonesty, Revere's conduct meets—or could be found by a jury to meet—the requisite standard of "outrageousness." If, however, one also looks at the reality of Borden's misconduct, the fact emerges that Borden was never entitled to expect to receive the prompt and full insurance coverage that Revere withheld (thus causing him distress). Being entitled to *no* coverage, he can scarcely complain if his benefits were delayed or curtailed by the substitution of a different policy. In such circumstances, is he really entitled to recover in damages for Revere's "outrageous" conduct? Since Revere owed him nothing, was it "outrageous" to give him less than he, unreasonably, wanted?

I am fully aware that the infliction of emotional distress is an independent tort. There can be little doubt that if Revere had threatened Borden or used extortionate tactics to wrest his original policy from him, Borden could properly have recovered for his anxiety stemming from the impact of those independently tortious acts, regardless of his own fraud in procuring the policy.[10] But if I read the record right, most of the "outrageous" conduct here amounts to no more than Revere's delay in paying benefits to Borden under the origi-

**10.** I do not doubt, for example, that if an insurer were to send thugs to an insured's house to beat him into surrendering a policy, that the insured could recover for this separately outrageous conduct even if the insured had procured the policy by fraud.

nal policy and its insistence that he switch to a lesser policy, without explaining the weaknesses of the successor policy. Since these were positions that Revere, as it later turned out, had every right to take, should not they be subtracted from the sum total of conduct a jury could properly regard as "outrageous" conduct for present purposes? If this were done, I doubt that sufficient actionable misconduct would be left to support the jury's finding against Revere.

I do not dissent as it is not clear to what extent, if at all, this theory was pursued below. Also the jury and the district court were fully exposed to this case and were perhaps in the best position to assess the competing equities in this decidedly odd equation. I am, nonetheless, troubled.