# IN THE SUPERIOR COURT OF THE STATE OF DELAWARE

ASHLAND LLC, INTERNATIONAL )
SPECIALTY PRODUCTS INC., ISP )
ENVIRONMENTAL SERVICES INC., )
AND ISP CHEMCO LLC, )
                                )
        Plaintiffs/Counterclaim )
        Defendants, )
                                )
          v. )    C.A. No. N15C-10-176 CCLD EMD
                                )
THE SAMUEL J. HEYMAN 1981 )
CONTINUING TRUST FOR LAZARUS )
S. HEYMAN, et al., )
                                )
        Defendants/Counterclaim )
        Plaintiffs. )

Submitted:  February 19, 2018
Decided: June 21, 2018

*Upon Defendant the Heyman Parties' Motion to Dismiss Count III of the Second Amended Complaint*
***DENIED***

Christopher Viceconte, Esquire, Gibbons P.C., Wilmington, Delaware, and Michael R. Griffinger, Esquire, William S. Hatfield, Esquire, and Camille V. Otero, Esquire, Gibbons P.C., Newark, New Jersey. *Attorneys for Ashland LLC, International Specialty Products, Inc., ISP Environmental Services, Inc., and ISP Chemco LLC*

Kevin G. Abrams, Esquire, John M. Seaman, Esquire, and April M. Ferraro, Esquire, Abrams & Bayliss LLP, Wilmington, Delaware, and Andrew J. Rossman, Esquire, Jonathan B. Oblak, and Sylvia E. Simson, Esquire, Quinn Emanuel Urquhart & Sullivan, LLP, New York, New York. *Attorneys for The Samuel J. Heyman 1981 Continuing Trust for Lazarus S. Heyman, et al.*

**DAVIS, J.**

## I. INTRODUCTION

This breach of contract case stemming from environmental liability allocation is assigned

to the Complex Commercial Litigation Division of the Court.  Plaintiffs[1] Ashland LLC,

---

[1] Plaintiff Chemco is a subsidiary of Plaintiff ISP.  Plaintiff IES is a subsidiary of Plaintiff Chemco.

International Specialty Products, Inc. ("ISP"), ISP Environmental Services Inc. ("IES"), and ISP Chemco LLC ("Chemco," collectively with all other plaintiffs "Ashland") filed the declaratory judgment and breach of contract case against Heyman Defendants—The Heyman Seller Defendants, The Heyman Trust Defendants, and Linden Property Holdings LLC ("LPH" collectively with all other defendants "Heyman Defendants").

On October 26, 2017, Ashland filed a second amended complaint (the "Second Amended Complaint") against the Heyman Defendants. The Second Amended Complaint included a claim for fraud as Count III. Heyman Defendants filed a Motion to Dismiss Count III (the "Motion"). Ashland filed their Answering Brief in Opposition to Defendants/Counterclaim Plaintiffs' Motion to Dismiss Count III of the Second Amended Complaint (the "Opposition"). Heyman Defendants filed their Reply Brief in Further Support of Heyman Parties' Motion to Dismiss Count III of the Second Amended Complaint (the "Reply").

For the reasons set forth below, the Court **DENIES** the Motion.

## II. RELEVANT FACTS[2]

The property involved in this civil action is located at 4000 Road to Grasselli, Linden, New Jersey (the "Linden Property").[3] The Linden Property has a chemical manufacturing history. From 1919 to 1991, non-parties GAF Corporation and GAF Chemicals Corporation owned and operated the Linden Property.[4] GAF Corporation and GAF Chemicals Corporation

---

[2] Unless otherwise indicated, the facts provided in this Opinion are the facts alleged in the Second Amended Complaint filed by Ashland. For purposes of the Motion, the Court must view the Second Amended Complaint's alleged facts in a light most favorable to Ashland. *See, e.g., Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 27 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Acad., LLC*, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).

[3] 2d Am. Compl. ¶ 32.

[4] *Id.* ¶ 33.

discovered extensive contamination at the Linden Property during the 1970s-80s.[5] The Heyman Defendants have owned GAF Corporation and GAF Chemicals Corporation since the 1980s.[6]

On June 16, 1989, GAF Chemicals Corporation and the New Jersey Department of Environmental Protection ("NJDEP") entered into an Administrative Consent Order (the "ACO") regarding environmental contamination and cleanup at the Linden Property.[7] The ACO made GAF Chemicals Corporation and "its principals, directors, officers, agents, successors, [and] assignees . . ." responsible for environmental remediation until the NJDEP gave GAF written notice it satisfied the ACO.[8]

In 1991, the Heyman Defendants incorporated ISP as a subsidiary of GAF Chemicals Corporation and incorporated IES as ISP's subsidiary.[9] GAF Chemicals Corporation then transferred ownership of the Linden Property to IES.[10] The parties agree that IES became the entity responsible for the ACO. In 1996, the Heyman Defendants spun off ISP (and IES) from GAF Chemicals Corporation.[11]

In 2006, Chemco executed an Administrative Consent Order Amendment (the "Amended ACO") with the NJDEP.[12] The Amended ACO did not replace the ACO. Instead, the Amended

---

[5] *Id.* ¶ 34.
[6] *Id.* ¶ 35.
[7] *Id.* ¶ 37. *See also* Compl. Ex. B.
[8] *See* Ex. B. at pp. 18, 22.
[9] 2d Am. Compl. ¶¶ 38–39.
[10] *Id.* ¶ 40.
[11] *Id.* ¶ 42.
[12] *Id.* ¶ 45. *See also* Compl. Ex. C, ¶ 4.

ACO supplemented and became a part of the ACO.[13]  The Amended ACO expressly provided

that IES would continue to comply with the terms of the ACO.[14]

In 2005 and 2007, the NJDEP sent letters advising the Heyman Defendants how to

address off-site contamination remediation efforts.[15]  The letters stated that the remedial efforts

were not complete and LPH did not have a fully implemented cleanup.[16]  Specifically, the 2005

NJDEP letter states:

> The Remedial Action Workplan and Remedial Action Report have addressed specific *on-site* remedial actions. The Department remains committed to the investigation, remediation and restoration of *off-site* impacts that have resulted from historic discharges by GAF/ISP.  The comments contained in this letter do not address GAF/ISP requirements (pursuant to the Spill Act, Technical Requirements for Site Remediation and the 1989 ACO) to expedite the resolution of these off-site discharges.  GAF/ISP must address these discharges through submissions required by these regulatory requirements as well as several correspondences (including but not limited to NJDEP letter to James Bizarro, GAF dated October 6, 1995)[emphasis added].[17]

The Heyman Defendants' outside environmental counsel had a copy of the 2005 NJDEP Letter.

Ashland never received the 2005 or 2007 NJDEP Letters until discovery for this litigation.[18]

### The Sale and Closing

In April 2011, counsel for the Heyman Defendants responded to a series of questions

asked by Ashland ("2011 Responses").[19]  In the April 2011 Responses, the Heyman Defendants

---

[13] Compl. Ex. C at ¶ 9 ("This ACO Amendment is intended to supplement the existing 1989 ACO.  The provisions of this ACO Amendment shall become part of the 1989 ACO.  The 1989 ACO, as amended, shall remain in full force and effect and [IES] shall continue to comply with the 1989 ACO.").  *See also id.* at ¶ 15 ("By the execution of this ACO Amendment, NJDEP does not release any person from any liabilities or obligations such person may have pursuant to any other applicable authority, nor does NJDEP waive any of its rights or remedies pursuant thereto.").  *See also* 2d Am. Compl. ¶¶ 48–49.
[14] 2d Am. Compl. ¶¶ 48-49.
[15] *Id.* ¶ 110.
[16] *Id.* ¶ 111.
[17] *Id.* ¶ 113.
[18] *Id.* ¶ 112.
[19] *Id.* ¶¶ 92-93.

discussed the groundwater No Further Action Letter.[20] The Heyman Defendants did not mention that any on-site or off-site remediation work remained outstanding.[21]

After receiving the 2011 Responses, the Parties engaged in a conference call ("2011 Conference Call").[22] The April 2011 Conference Calls led Ashland to believe that all remedial measures were taken regarding the Linden Property. Based on the representations made in the April 2011 Conference Calls, Ashland agreed to the liability provision. Ashland contends the Heyman Defendants hid relevant documents from Ashland. Ashland alleges that the hidden documents "would have disclosed material information relating to the environmental condition and status of the [Linden Property] . . . ."[23]

In May 2011, Ashland acquired ISP, IES, and Chemco from the Heyman Defendants for $3.2 billion.[24] This was done through a Stock Purchase Agreement, dated as of May 31, 2011 (the "SPA") between the Heyman Defendants (as the "Seller Parties") and Ashland (as the "Buyer").[25] The Heyman Defendants wanted to retain the Linden Property. So, on August 23, 2011, immediately after the SPA closed, IES conveyed the Linden Property back to the Heyman Defendants for one dollar.[26] Defendant LPH operates the Linden Property.[27]

The SPA set out the parties' respective obligations regarding the Linden Property. SPA Section 2(e) to Schedule 5.19 of the SPA[28] states:

> In connection with the Linden Transfer, the Seller Parties shall assume all Liabilities to the extent related to or arising from or existing at the Linden Property, including Liabilities arising under or relating to (i) Environmental Laws, provided

---

[20] *Id.*
[21] *Id.* ¶ 94.
[22] *Id.* ¶ 96.
[23] *Id.* ¶ 204.
[24] *Id.* ¶ 51.
[25] *Id.* ¶¶ 51-52.
[26] *Id.* ¶ 60.
[27] *Id.* ¶ 58.
[28] Any further reference to SPA Sections 2 and 4 of Schedule 5.19 of the SPA will omit reference to Schedule 5.19 and will be as "SPA Section 2_" or SPA Section 4_."

5

that such Liabilities shall not include any off-site migration or disposal of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing,…or (v) the Linden Transfer (including any Liabilities to the extent arising by virtue of the delivery of a limited warranty deed, but excluding any Liabilities arising out of or relating to fraudulent conveyance or similar liability), in each case, other than as set forth in the provision in clause (i) above, whether arising before, on or after the Closing Date (the "Linden Excluded Liabilities").[29]

SPA Section 2(f) also discusses the Linden Property transaction—specifically the

"Linden Transfer"[30]—and states:

In connection with the Linden Transfer, the Seller Parties shall be responsible, at their sole cost and expense, for compliance, if applicable, with any requirements of the Industrial Site Recovery Act ("ISRA") and, if ISRA applies to the Linden Transfer, Seller Parties shall (i) within five (5) Business Days after execution of this Agreement, make any required filings or notifications (such as a General Information Notice, as defined under ISRA) to the [NJDEP], and (ii) use reasonable best efforts to, prior to closing, make all other filings, undertake all other measures, including where required undertaking any site investigation or Remedial Action required by ISRA. In addition, the [SPA] Seller Parties shall use reasonable best efforts to amend any consent decree or other binding agreement with any Governmental Entity relating to the Linden Excluded Liabilities, and to replace or substitute any related financial assurance (including any bond or letter of credit), to include the name of the Linden Transferee following the Linden Transfer and, if permitted by NJDEP, to remove the name of ISP or any of the Companies therefrom.[31]

Paragraph 2 of the Contribution Agreement mirrors SPA Section 2(e).[32] That is, LPH,

whose membership interests were transferred from Ashland to the Heyman Defendants, became

responsible for:

All liabilities to the extent related to or arising form or existing at the Linden Property, including Liabilities arising under or relating to (a) Environmental Laws (provided that such Liabilities shall not include any off-site migration or disposal

---

[29] Compl. Ex. A, p. 14. (emphasis in original).
[30] The "Linden Transfer" is defined in SPA Section 2(a). *See* Compl. Ex. A, p. 14.
[31] *Id.*
[32] Defs.' Countercls. ¶ 51.

of Hazardous Materials from the Linden Property prior to the Closing, any claims or damages associated with any off-site migration or disposal of Hazardous Material from the Linden Property prior to the Closing, and for the avoidance of doubt, any off-site contamination of soils, groundwater or sediments, any third party superfund sites including the Newark Bay Complex, any natural resources damages or exposure claims relating to operations or discharges prior to Closing).[33]

SPA Section 3.26 is a No Other Representations or Warranties Provision. Section 3.26 states:

Except for the representations and warranties contained in this Agreement, none of the Seller Parties nor any of their respective Affiliates (including the Companies), nor any of their respective stockholders, trustees, directors, officers, employees, Affiliates, advisors, members, fiduciaries, agents or representatives, nor any other Person has made or is making any other representation or warranty of any kind or nature whatsoever, oral or written, express or implied, with respect to the Seller Parties, their respective Affiliates, the Business, the Companies, the Shares, this Agreement or any Ancillary Agreement or the Transactions, including any relating to the financial condition, results of operations, assets or Liabilities of any of the foregoing entities. Except for the representations and warranties contained in this Agreement and other than for fraud, (a) each Seller Party disclaims, on behalf of itself, and its Affiliates (including the Companies), any other representations or warranties, whether made by any of the Seller Parties, any of their respective Affiliates (including the Companies), any of their respective stockholders, trustees, directors, officers, employees, Affiliates, advisors, members, fiduciaries, agents or representatives or any other Person, . . .

On June 3, 2011, an attorney prepared a memorandum (the "ISRA Memorandum")

discussing the implications of New Jersey law relating to the properties acquired under the SPA.

Specifically, the ISRA Memorandum states:

The Linden NJ property owned by ISP Environmental Services, Inc. is vacant land. Although at one time it was the location of an operating chemical plant, operations ceased there in approximately 1991. A filing under ISRA for the cessation of operations was made prior to that time, and in 2002, NJDEP approved a site wide Remedial Action Workplan, which was fully implemented. A No Further Action Letter was issued for the soils on the site and it is anticipated that a No Further Action Letter will be issued shortly for the ground water.

Once the filing was made for the cessation of operations at the Linden site, and the site was shut down, and the NJDEP approved a site wide Remedial Action Workplan, the facility is no longer considered an industrial establishment for ISRA purposes pursuant to N.J.A.C. 7:26B-1.4. Attached hereto are the comments to the

---

[33] *Id.*

7

adoption N.J.A.C. 7:26B-1.4 published at 29 N.J.R. 4913(a) clarifying that it is the NJDEP's policy that after the issuance of a Remedial Action Workplan, the property is no longer an industrial establishment for purposes of ISRA.[34]

The parties closed on the SPA on August 23, 2011.

### The Heyman Defendants' "Reasonable Best Efforts"

On July 18, 2011, prior to closing on the SPA, IES notified NJDEP of the pending Linden Property transfer, and advised NJDEP that IES (or any ISP affiliate) would not be associated with the Linden Property after August 25, 2011.[35] The letter did not advise NJDEP that LPH was required to become a party on the ACO and that IES was to be removed.[36]

Subsequent to closing, LPH performed affirmative duties under the ACO. It replenished the outstanding letter of credit.[37] LPH made payments to New Jersey to comply with its portion of the ACO.[38] In addition, LPH applied for Remedial Action Permits ("RAPs") for soil and groundwater at the Linden Property.[39] On February 17, 2012, NJDEP issued RAPs for soil and groundwater at the Linden Property to LPH only.[40] IES is not mentioned in either RAP.[41]

On July 3, 2012, LPH's Environmental Compliance manager requested from NJDEP a full satisfaction compliance letter.[42] LPH did not mention IES, ISP, or Chemco in its letter.[43] On December 23, 2013, NJDEP denied LPH's full compliance request.[44] NJDEP's letter

---

[34] Mot., Ex. 9.
[35] 2d Am. Compl. ¶ 62; *see also* Compl., Ex. D.
[36] 2d Am. Compl. ¶ 63.
[37] *See id.* at ¶¶ 62, 64.
[38] *Id.* ¶ 68.
[39] *Id.*
[40] *Id.* ¶ 69 ("The reference site name on that permit and on correspondence from NJDEP forwarding the permit to LPH on that date is 'Linden Property Holdings LLC/Former GAF Chemical Corporation Site.'").
[41] *Id.* ¶ 70.
[42] *Id.* ¶ 74.
[43] *Id.*
[44] *Id.* ¶ 75.

8

specifically required an investigation, ecological risk assessment, and remediation of off-site contamination.[45]

On January 21, 2014, LPH again requested a full satisfaction letter from NJDEP.[46] LPH also mentioned, purportedly for the first time, that IES transferred the Linden Property to LPH, and LPH had taken over on-site responsibilities.[47] LPH also alleged that IES was responsible for any off-site remediation pursuant to the ACO.[48]

On February 7, 2014, LPH's in-house counsel advised Ashland that additional remedial work, including an ecological risk assessment, remained.[49] Ashland contends this is the first time the Heyman Defendants advised Ashland that off-site work remained. Ashland contends that Heyman Defendants had been aware of the off-site requirements since 2007.[50]

Ashland responded on February 18, 2014.[51] Ashland requested that, pursuant to the SPA, LPH: (i) amend the ACO to add LPH as a party; (ii) obtain NJDEP approval to remove IES from that ACO; (iii) obtain an extension of the statutory deadline to complete remediation investigations; and (iv) complete all work necessary to comply with the ACO.[52] Ashland also requested that, pursuant to the SPA, the Heyman Defendants copy Ashland on all future correspondence and submissions to the NJDEP.[53] The Heyman Defendants did not seek an extension of the statutory deadline to complete work. So, Ashland retained a Licensed Site Remediation Professional ("LSRP").[54] On March 19, 2014, Ashland's LSRP submitted a

---

[45] *Id.*
[46] *Id.* ¶ 83.
[47] *Id.*
[48] *Id.*
[49] *Id.* ¶ 85.
[50] *Id.*
[51] *Id.* ¶ 90.
[52] *See id.*
[53] *See id.*
[54] *Id.* ¶ 91.

9

Remedial Investigation Complete Timeframe Extension Form, and obtained an extension of the statutory deadline to complete remedial work.[55]

On April 9, 2014, LPH wrote to the NJDEP. LPH argued that, under the SPA, it agreed to assume on-site liabilities and Ashland assumed off-site liabilities under the ACO.[56] Further, LPH contended that all on-site remediation was complete.[57] On December 18, 2014, the NJDEP informed LPH that: a) its liabilities were not limited to on-site, and b) it was obligated to complete a remedial investigation pursuant to the Spill Act and N.J.S.A. 58:10B-1.3 as the property owner.[58]

On July 23, 2015, the Office of the Attorney General of New Jersey advised LPH that its $7,744,000 remediation source established in 2011 was solely "a replacement of the [remediation funding source] originally required by the ACO for remediation of the entire site, including remediation of offsite contamination."[59] The Office of the Attorney General advised that the NJDEP was authorized to draw upon the $7,744,000 remediation source to complete remediation of the off-site liabilities.[60] Concurrently, the NJDEP sent Ashland and GAF (and its successors) a Demand for Stipulated Penalties for the parties' collective failure to comply with the ACO.[61]

### The Litigation

Ashland filed their complaint (the "Complaint") against the Heyman Defendants on October 20, 2015. The Complaint sought a declaratory judgment for: (i) breach of contract – against Heyman Defendants; (ii) breach of implied covenant of good faith and fair dealing – against Heyman Defendants; (iii) unjust enrichment – against Heyman Defendants; (iv) cost

---

[55] *Id.* ¶ 126.
[56] *Id.* ¶ 88.
[57] *See id.*
[58] *See id.* ¶ 93.
[59] *Id.* ¶ 94.
[60] *Id.*
[61] *Id.* ¶ 109.

10

recovery and contribution under the Spill Act – against LPH; and (v) unjust enrichment – against LPH.

Ashland filed an amended complaint (the "First Amended Complaint") on December 3, 2015. The First Amended Complaint alleged the same five causes of action asserted in the Complaint. The claims relate to purported obligations of the Heyman Defendants in connection with SPA Schedule 5.19 and purported responsibility for the investigation, remediation, and cleanup costs regarding environmental contamination of the Arthur Kill, an off-site location. Neither the Complaint nor the First Amended Complaint mentions the ISRA Memorandum.

On January 6, 2016, the Heyman Defendants filed their Answer to the Complaint and Counterclaims. The Counterclaims assert six causes of action related to the same off-site liabilities associated with the LPH Property. Counts II and III of the Counterclaims are (i) Breach of Contract and (ii) Declaratory Judgment – Breach of Contract claims asserted by the SPA Seller Successor Parties and RFH against Ashland in light of Ashland's purported breach of Section 2(e) of Schedule 5.19 of the SPA. Counterclaim Count V alleged liability under the Spill Act.

On October 26, 2017, Ashland filed its Second Amended Complaint. The Second Amended Complaint seeks: (1) declaratory judgment for breach of contract; (2) breach of the implied covenant of good faith and fair dealing; (3) fraud; (4) unjust enrichment against Heyman; (5) cost recovery and contribution under the Spill Act; and (6) unjust enrichment against LPH. The Second Amended Complaint is fifty-eight pages long and contains two hundred and thirty-six allegations.

On November 15, 2017, the Heyman Defendants filed the Motion. On December 18, 2017, Ashland filed the Opposition. On January 9, 2018, the Heyman Defendants filed the Reply.

On February 19, 2018, the Court held a hearing (the "Hearing") on the Motion, Opposition, and Reply. The Court took the matter under advisement.

## III. PARTIES' CONTENTIONS

### A. THE SECOND AMENDED COMPLAINT COUNT III

Count III alleges that the Heyman Defendants made fraudulent misrepresentations and/or omissions of fact regarding the environmental condition and remediation of the Linden Property.[62] Ashland alleges that Heyman Defendants: (i) made misleading statements and/or omissions of fact in the Pre-SPA Representations/Omissions, notwithstanding a duty to make a full and fair disclosure; (ii) made false representations of fact when they provided the ISRA Memorandum on June 3, 2011, which misrepresented that NJDEP approved a "site-wide" Redial Action Workplan and that Workplan was fully implemented; and (iii) purposefully withheld documents from Ashland that showed NJDEP had not approved a site-wide Remedial Action Workplan, the ACO was not complete because cleanup was not fully implemented, and there were significant unmet obligations under the ACO.[63] Ashland contends that the Heyman Defendants' misrepresentation and omission occurred prior to execution of the SPA and in the period between execution of the SPA and closing.[64]

---

[62] 2d Am. Compl. ¶¶ 92-121.
[63] *Id.* ¶ 199-201.
[64] *See, e.g., Id.* ¶¶ 93-97 and ¶¶ 101-107.

12

**B.     MOTION**

The Heyman Defendants argue that: (i) Ashland cannot allege a fraud claim premised on the ISRA Memorandum after the SPA was executed; (ii) Ashland cannot sustain any fraud claim premised on extra-contractual omissions; (iii) Ashland's fraud claim must be dismissed because it is inconsistent with its contractual allegations; and (iv) Ashland's fraud claim must fail because the damages are duplicative of its breach of contract damages.

**C.     OPPOSITION**

Ashland argues that: (i) the fraud claim is timely; (ii) Heyman Defendants attempt to insert facts outside the second amended complaint; (iii) Count III is adequately pled; (iv) the SPA permits a fraud claim based upon extra-contractual representations; and (v) Count III is pled in the alternative to the breach of contract claim.

## IV. STANDARD OF REVIEW

**A.     12(B)(6) FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED**

Upon a motion to dismiss, the Court (i) accepts all well-pleaded factual allegations as true, (ii) accepts even vague allegations as well-pleaded if they give the opposing party notice of the claim, (iii) draws all reasonable inferences in favor of the non-moving party, and (iv) only dismisses a case where the plaintiff would not be entitled to recover under any reasonably conceivable set of circumstances.[65]  However, the court must "ignore conclusory allegations that lack specific supporting factual allegations."[66]

---

[65] *See Central Mortg. Co. v. Morgan Stanley Mortg. Capital Holdings LLC*, 227 A.3d 531, 536 (Del. 2011); *Doe v. Cedars Academy,* No. 09C-09-136, 2010 WL 5825343, at *3 (Del. Super. Oct. 27, 2010).
[66] *Ramunno v. Crawley,* 705 A.2d 1029, 1034 (Del. 1998).

**B.     9(B) FRAUD PLED WITH PARTICULARITY**

Under Superior Court Civil Rule 9(b), a plaintiff must plead fraud and negligence with particularity.[67]  "The purpose of [Rule 9(b)] is to apprise the adversary of the acts or omissions by which it is alleged that a duty has been violated."[68]  To plead fraud or negligence with the particularity required by Rule 9(b), a plaintiff must include the "time, place, contents of the alleged fraud or negligence, as well as the individual accused of committing the fraud" or negligence.[69]

As a preliminary matter, the Court finds that the Second Amended Complaint has pleaded fraud with sufficient particularity.

## V. DISCUSSION

**A.     FRAUD AND STATUTE OF LIMITATIONS**

To plead a claim of fraud, plaintiff must show:

> (1) a false representation, usually one of fact . . .; 2) the defendant's knowledge or belief that the representation was false, or was made with reckless indifference to the truth; 3) an intent to induce the plaintiff to act or to refrain from acting; 4) the plaintiff's action or inaction taken in justifiable reliance upon the representation; and 5) damage to the plaintiff as a result of such reliance.[70]

In Delaware, there are three types of fraud: "(1) false statements represented as truth; (2) active concealment of facts which prevents the other party from discovering them; and (3) silence in the face of a duty to speak."[71]

---

[67] Super. Ct. Civ. R.  9(b).
[68] *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971).
[69] *See TrueBlue, Inc.*, *v. Leeds Equity Partners IV, LP*, 2015 WL 5968726, at *6 (Del. Super. Sept. 25, 2015) (quoting *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012)).
[70] *Hauspie v. Stonington Partners, Inc.*, 945 A.2d 584, 586 (Del. 2008) (quoting *Gaffin v. Teledyne, Inc.,* 611 A.2d 467, 472 (Del.1992)).
[71] *DRR, L.L.C. v. Sears, Roebuck & Co.*, 949 F. Supp. 1132, 1137 (D. Del. 1996).

14

The statute of limitations for fraud in Delaware is three years.[72] "The statute of limitations begins to run when a plaintiff's claim accrues, which occurs at the moment of the wrongful act. . . ."[73] For fraud, the statute of limitations begins to run when the fraud is "successfully perpetrated."[74]

The statute of limitations may toll when premised on an inherently unknowable injury. However, tolling only applies "in certain narrowly carved out limited circumstances when the facts at the heart of the claim are so hidden that a reasonable plaintiff could not timely discover them."[75] The statute of limitations is tolled "where the injury is inherently unknowable and the claimant is blamelessly ignorant of the wrongful act and the injury complained of."[76] The Court will consider if there were "red flag[s] that clearly and unmistakably would have led a prudent person of ordinary intelligence to inquire" and obtain discovery relating to the claim.[77]

If tolled, the statute of limitations begins to run "upon the discovery of facts constituting the basis of the cause of action or the existence of facts sufficient to put a person on inquiry which, if pursued, would lead to the discovery of such facts."[78] "These facts must usually be observable or objective factors that would alert laymen to the problem."[79] However, the mere existence of documents accessible to the public will not automatically preclude tolling.[80]

---

[72] 10 *Del. C.* § 8106; *see also* SPA § 9.8 stating that Delaware law governs; *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *3 (Del. Super. Dec. 29, 2015) (stating that "the general rule is that the forum state's statute of limitations applies.").

[73] *Airport Bus. Ctr. V LLLP v. Sun Nat. Bank*, 2012 WL 1413690, at *7 (Del. Super. Mar. 6, 2012).

[74] *Playtex, Inc. v. Columbia Cas.*, 1993 WL 390469, at *3 (Del. Super. Sept. 20, 1993).

[75] *AM Gen. Hldg. LLC v. Renco Grp., Inc.*, 2016 WL 4440476, at *13 (Del. Ch. Aug. 22, 2016).

[76] *Island Farm, Inc. v. Master Sidlow & Assocs., P.A.*, 2007 WL 2758775, at *2 (Del. Super. Sept. 20, 2007) (internal quotations omitted).

[77] *Coleman v. Price WaterhouseCoopers LLC*, 854 A.2d 838, 843 (Del. 2004).

[78] *Id.* at 842.

[79] *Island Farm*, 2007 WL 2758775, at *2.

[80] *See Boyce v. Blenheim at Bay Pointe, LLC*, 2014 WL 8623125, at *3 (Del. Super. Dec. 30, 2014).

Superior Court Civil Rule 15(c)(2) allows, under certain circumstances, a subsequently asserted claim to relate back to the date of the original pleading. When the original complaint filed in the case gave notice to the defendant of all the facts which will be relied upon at the trial, the claim arises from the same occurrence described in the original complaint, and the plaintiff will rely on the same operative facts, then the amendment will relate back to the date of the original pleading.[81] To relate back to the original pleading, the determinative factor is whether the defendant should have had notice from the original pleadings that the plaintiff's new claim may have been asserted against the defendant.[82]

For Count III, Ashland alleges the fraud occurred between April and the closing of the SPA. Absent tolling, any fraud claim is barred as of August 23, 2014. This case was filed on October 20, 2015—outside the three-year statute of limitations. Ashland filed the Second Amended Complaint on October 26, 2017—which is the first time Ashland asserts the fraud claim. Therefore, Ashland's fraud claim is barred unless it was tolled.

In this case, Ashland contends that the Heyman Defendants made statements about the Linden Property that indicated NJDEP would not require any additional remediation efforts with respect to that property. Based on those representations, Ashland entered into SPA. Although the 2005 and 2007 NJDEP letters were matters of public record, Ashland alleges it did not conduct an inquiry into the property based on the representations made by the Heyman Defendants.[83] Ashland did not fully perform independent environmental due diligence on the Linden Property. Ashland, instead, relied upon responses made by the Heyman Defendants to

---

[81] *See Rogers v. Delaware Power & Light Co.*, 95 A.2d 842 (Del. 1953); *see also Oakes v. Gilday*, 351 A.2d 85 (Del. Super. 1976) (the amended pleading must arise out of the same conduct, transaction or occurrence set forth in the original pleading to relate back).

[82] *Bissell v. Papastavros' Assocs. Medical Imaging*, 626 A.2d 856 (Del. Super. 1993).

[83] *See Playtex*, 1993 WL 390469, at *5 ("The requirement of diligence is only meaningful . . . when facts exist that would excite the inquiry of a reasonable person . . . Due diligence is not required in the abstract. Plaintiffs are not under a duty continually to scout around to uncover claims which they have no reason to suspect they might have.").

16

specific inquiries sent by Ashland. Based on those answers, Ashland believed there were no outstanding requirements by the NJDEP regarding the Linden Property. In addition, Ashland alleges that the Heyman Defendants took affirmative steps to conceal from Ashland any documents that would reveal the material misrepresentations or omissions, including the withholding of letters from NJDEP sent in 2005 and 2007, shipping of documents related environmental regulatory documents regarding the Linden Property to outside vendors and ISP's outside environmental counsel without notifying Ashland, concealing the existence of related documents in a warehouse in Bellville, New Jersey.[84] In addition, LPH communicated with NJDEP after August 25, 2011 but did not notify Ashland of these communications and potential liability until February 7, 2014.[85] As alleged, these facts are sufficient to support a claim that the statute of limitations was tolled until sometime from December 23, 2013—the date Ashland received a letter from the NJDEP stating that the Linden Property was not in compliance with the ACO.[86]

However, the fraud claim is still time barred unless it relates back to the original Complaint. Ashland does not allege fraud in the original Complaint. In fact, Ashland first asserts its fraud claim in the Second Amended Complaint which Ashland filed on October 26, 2017. The Court finds that the original Complaint sufficiently put the Heyman Defendants on notice of a potential fraud claim. In the original Complaint, Ashland asserts that the Heyman Defendants withheld documents, including the 2005 and 2007 NJDEP Letters.[87]

---

[84] *See, e.g.*, 2d Am. Compl. ¶¶ 111, 113-117, 120, and 121.
[85] *See, e.g., Id.* ¶¶ 65-68.
[86] *See id* (discussing *Bordon v. Paul Revere Life Ins. Co.*, 935 F.2d 370 (1st Cir. 1991)) (stating "that the prior back complaint was inherently unknowable in view of the information provided on the application . . . [plaintiff] made no mention of back problems in response to questions on the application designed to elicit such information.").
[87] Compl. ¶ 66-67.

17

While the original Complaint does not mention the April 2011 Conference Calls leading to the execution of the SPA, the original Complaint does discuss LPH's actions in dealing with NJDEP between closing and December 23, 2013 without informing Ashland of these actions. The original Complaint and the First Amended Complaint filed on December 3, 2015 do not mention the ISRA Memorandum or the April 2011 Conference Calls. Although Ashland did not mention the ISRA Memorandum of April 2011 Conference Calls in the first two complaints, these statements related to the same transaction and occurrence involving the omission of the 2005 and 2007 NJDEP Letters raised earlier. Therefore, under Rule 15(c)(2), Ashland can rely on the ISRA Memorandum or the April 2011 Conference Calls.

Ashland also argues that the concealment of the ISRA Memorandum further demonstrates the fraud by the Heyman Defendants as part of a continuing fraud. The Heyman Defendants' failure to disclose the ISRA Memorandum furthers Ashland's tolling argument. Had the ISRA Memorandum properly been disclosed, Ashland contends that it would have contradicted statements made during the Conference Call about no outstanding environmental liability.

**B.      ISRA MEMORANDUM AFTER THE SPA IS EXECUTED**

*i. Ashland received ISRA Memorandum after execution of the SPA*

A plaintiff cannot rely on a misrepresentation made after the parties executed an agreement for a fraudulent inducement claim. Fraudulent statements made after the execution of an agreement "relate to the performance of the contract, not the inducement of the contractual relationship.[88]  Statements made after the formation of the contract "are better addressed by applicable contract law."[89]  In fact, this Court has stated "[a] claim for fraudulent inducement

---

[88] *Abbot Labs. v. Owens*, 2014 WL 8407613, at *8-9 (Del. Super. Sept. 15, 2014).
[89] *Brasby v. Morris*, 2007 WL 949485, at *7-8 (Del. Super. Mar. 29, 2007).

accrues when the fraudulent statements were made, which must be on or before the date when the parties entered into the contract."[90]

The SPA is dated May 31, 2011.[91] The ISRA Memorandum is dated June 3, 2011.[92] It appears that Ashland could not have received a draft of the ISRA Memorandum before they signed the SPA. Further, Ashland has not contended that the ISRA Memorandum was part of negotiations and only executed a few days after the SPA. Because a party many not rely on information provided after a contract is executed to maintain a fraudulent inducement claim, Ashland should not be allowed to pursue their fraud claim relating to the ISRA Memorandum alone. However, Ashland does allege it relied on the ISRA Memorandum in the time between execution of the SPA and closing. As such, it appears that the ISRA Memorandum is part of the alleged continuing fraud. Ashland argues that Heyman Defendants told a partial truth and hid contradictory information. As alleged, the ISRA Memorandum further supports the alleged fraud because it gave Ashland incorrect and incomplete information that furthered the information provided during the Conference Call. Although the ISRA Memorandum could not be the sole basis of the fraud claim, the ISRA Memorandum is relevant in relation to the omissions and statements made during the Conference Call.

---

[90] *Pivotal Payments Direct Corp. v. Planet Payment, Inc.*, 2015 WL 11120934, at *4 (Del. Super. Dec. 29, 2015).
[91] Mot., Ex. 4.
[92] Mot., Ex. 9.

### ii. ISRA Memorandum contained SPA Seller Parties' Opinion

Generally, opinions cannot form the basis of a claim for fraud.[93] The "mere expressions of opinion as to probable future events cannot be deemed fraud or misrepresentation."[94] However, a claim for fraud may be appropriate if one "provide[s] a false representation of one's opinion."[95] Additionally, "even an opinion may rise to the level of a misstatement of fact."[96] Particularly where the person rendering an opinion has "special or superior knowledge."[97]

> The mere fact that a material statement is in the form of an opinion . . . is not necessarily conclusive as to whether it must be treated as such, or whether it can be regarded as a representation of fact, because an opinion may carry with it the implication that the maker is aware of facts that support or justify that opinion. Where a recipient does not know the facts, he may justifiab[ly] rely upon [the] implied assertions and recover on the basis of a misrepresentation of implied fact.[98]

But, "[w]hether or not [a] sales agents expressed 'opinions' or outright misleading facts is a question of fact, and cannot be determined on a Motion to Dismiss."[99]

The ISRA Memorandum states that "in 2002, NJDEP approved a site wide Remedial Action Workplan, which was fully implemented. A No Further Action Letter was issued for the soils on the site and it is anticipated that a No Further Action Letter will be issued shortly for the ground water."[100] The Heyman Defendants' counsel prepared the ISRA Memorandum for Ashland. The ISRA Memorandum seems to explain the possible implications of New Jersey's ISRA statute regarding the transfer of property, including the Linden Property. The statements

---

[93] *See BAE Sys. N.A. Inc. v. Lockheed Martin Corp.*, 2004 WL 1739522, at *7 (Del. Ch. Aug. 3, 2004); *Trenwick Am. Litig. Tr. v. Ernst & Young, L.L.P.*, 906 A.2d 168, 209 (Del. Ch. 2006), *aff'd sub nom. Trenwick Am. Litig. Tr. v. Billett*, 931 A.2d 438 (Del. 2007) (finding that "statements of expectation or opinion about the future of the company and the hoped for results of business strategies . . . are generally not actionable under Delaware law").
[94] *Mentis v. Delaware Am. Life Ins. Co.*, 1999 WL 744430, at *7 (Del. Super. July 28, 1999), *on reargument*, 1999 WL 1240818 (Del. Super. Nov. 5, 1999) (citing *Biasotto v. Spreen*, 1997 WL 527956 (Del. Super. July 30, 1997)).
[95] *BAE Sys.*, 2004 WL 1739522, at *7 n.50.
[96] *Tam v. Spitzer*, 1995 WL 510043, at *8 (Del. Ch. Aug. 17, 1995).
[97] *Id.*
[98] *RHA Constr., Inc. v. Scott Engr., Inc.*, 2013 WL 3884937, at *3 (Del. Super. July 24, 2013).
[99] *Mentis*, 1999 WL 744430, at *7.
[100] Mot., Ex. 9.

made in the ISRA Memorandum may consist of opinion, however, the statements about the Linden Property appear to be sufficiently definite to be a fact or a fact relied on to form the opinions contained in the ISRA Memorandum. As such, this is a question of fact not appropriate to decide on a motion.

## C.  EXTRA-CONTRACTUAL OMISSIONS

### i. Ashland can rely on omissions to advance its fraud claim

Omissions cannot support a claim for fraud in the absence of a fiduciary relationship. In a transactional setting between two equally represented and sophisticated parties, no such relationship exists. "Because a party in an arms' length contractual setting begins the process without any affirmative duty to speak, any claim of fraud in an arms' length setting necessarily depends on some form of representation."[101] "A fraud claim in that setting cannot start from an omission."[102] In fact, "[a]bsent a special relationship, a party is under no duty to disclose 'facts of which he knows the other is ignorant' even if 'he further knows the other, if he knew of them, would regard [them] as material in determining his course of action in the transaction in question."[103]

However, "if a party in an arms' length negotiation chooses to speak, then it cannot lie."[104] "[O]nce a party speaks, it also cannot do so partially or obliquely such that what the party conveys becomes misleading."[105] Further, a party may need to disclose information "in order to prevent statements actually made from becoming misleading."[106]

---

[101] *Prairie Capital III, L.P. v. Double E Hldg. Corp.*, 132 A.3d 35, 52 (Del. Ch. 2015).
[102] *Id.*
[103] *Id.* (quoting *Prop. Assoc. 14 v. CHR Hldg. Corp.*, 2008 WL 963048, at *6 (Del. Ch. April 10, 2008)); Restatement (Second) of Torts § 551 cmt. a.
[104] *Prairie*, 132 A.3d at 52 (citing *Stephenson v. Capano Dev., Inc.*, 462 A.2d 1069, 1074 (Del. 1983)).
[105] *Id.*
[106] *Stephenson,* 462 A.2d 1074.

"A party may use external sources of information to plead that a contractually identified fact was false or misleading, but a party cannot point to extra-contractual information and escape the contractual limitation by arguing that the extra-contractual information was incomplete."[107] Therefore, for an arms' length deal, "contractual provisions that identify the representations on which a party exclusively relied define the universe of information that is in play for purposes of a fraud claim."[108]

During the April 2011 Conference Call, Heyman Defendants represented that "a barrier wall had been installed and a pump-and-treat remedy was in place."[109] The Heyman Defendants "further represented that reserves were in place for 20 years of operation and maintenance of completed remedial measures."[110] Ashland contends that the Heyman Defendants did not mention "any ongoing on-site or off-site remediation, or any one-site or off-site remediation that

---

[107] *Prairie*, 132 A.3d at 52.

[108] *Id; see also FdG Logistics LLC v. A&R Logistics Hldgs., Inc.*, 131 A.3d 842, 859 (Del. Ch. 2016) (quoting *Abry Partners V, L.P. v. F & W Acq. LLC*, 891 A.2d 1032, 1057 (Del. Ch. 2006)) (stating there is a "need to strike an appropriate balance between holding sophisticated parties to the terms of their contracts and simultaneously protecting against the abuses of fraud."); *TrueBlue, Inc. v. Leeds Equity Partners IV, LP,* 2015 WL 5968726, at *6 (Del. Super. Sept. 25, 2015) (Integration clauses "must clearly state that the parties disclaim reliance upon extra-contractual statements."). In balancing the public policy against fraud with the ability of sophisticated parties to contract for integration clauses, Delaware Courts have:

> consistently [ ] respected the law's traditional abhorrence of fraud in implementing this reasoning. Because of that policy concern, we have not given effect to so-called merger or integration clauses that do not clearly state that the parties disclaim reliance upon extra-contractual statements. Instead, we have held, as in *Kronenberg,* that murky integration clauses, or standard integration clauses without explicit anti-reliance representations, will not relieve a party of its oral and extra-contractual fraudulent representations. The integration clause must contain "language that ... can be said to add up to a clear anti-reliance clause by which the plaintiff has contractually promised that it did not rely upon statements outside of the contract's four corners in deciding to sign the contract." This approach achieves a sensible balance between fairness and equity—parties can protect themselves against unfounded fraud claims through explicit anti-reliance language. If parties fail to include unambiguous anti-reliance language, they will not be able to escape responsibility for their own fraudulent representations made outside of the agreement's four corners.

*Abry*, 891 A.2d at 1058-59 (quoting *Kronenberg v. Katz*, 872 A.2d 568, 592–93 (Del. Ch. 2004)).

[109] 2d Am. Compl. ¶ 97.

[110] *Id.*

22

would be required going forward."[111]  Ashland understood the Heyman Defendants representations to mean that there "were no significant unmet environmental liabilities associated with the [Linden Property]."[112]

At the Hearing, Ashland noted that it asked for information about the remediation efforts of the Property.  The Heyman Defendants told Ashland to look at the data room for any information.  There were no documents indicating that further action was needed for the Property.  Because information was missing from the data room and statements made during the Conference Call, Ashland relied upon those omissions and statements when it entered into the SPA.

Ashland sufficiently pleaded the fraud claim and may rely upon the omissions and the Conference Call in its case.  These omissions and representations are sufficient for a fraud claim.  Based on the allegations, the Heyman Defendants could not provide a half-truth during the due diligence process of the SPA.  Heyman Defendants reliance on the merger clause of the SPA fails as well.  Ashland argues that Heyman Defendants made representations during the Conference Calls that indicated there was no outstanding liability for the Property.  Then, Ashland searched the data room and did not find contradictory evidence.  The 2005 and 2007 NJDEP Letters were not included in the data room.  Then, after the parties executed the SPA, but before closing, Heyman Defendants provided the ISRA Memorandum that further indicated there was no outstanding liability for the Property.  Based on this claim, Ashland may rely upon the Conference Calls, the omissions of the NJDEP Letters from the data room, and the ISRA Memorandum in the face of the merger clause in the SPA to further the fraud claim.

---

[111] *Id.*
[112] *Id.* ¶ 98.

***ii. Ashland properly pleaded the omissions and statements during the Conference Call with particularity***

Under Superior Court Civil Rule 9(b), a plaintiff must plead fraud and negligence with particularity.[113] "The purpose of [Rule 9(b)] is to apprise the adversary of the acts or omissions by which it is alleged that a duty has been violated."[114] To plead fraud or negligence with the particularity required by Rule 9(b), a plaintiff must include the "time, place, contents of the alleged fraud or negligence, as well as the individual accused of committing the fraud" or negligence.[115]

Ashland sufficiently pleads fraud under Rule 9(b) relating to the April 2011 Conference Calls. During the April 2011 Conference Call, Heyman Defendants represented that "a barrier wall had been installed and a pump-and-treat remedy was in place."[116] The Heyman Defendants "further represented that reserves were in place for 20 years of operation and maintenance of completed remedial measures."[117] Ashland contends that the Heyman Defendants did not mention "any ongoing on-site or off-site remediation, or any one-site or off-site remediation that would be required going forward."[118] Ashland understood the Heyman Defendants representations to mean that there "were no significant unmet environmental liabilities associated with the [Linden Property]."[119]

Ashland sufficiently pleads fraud under Rule 9(b) relating to the April 2011 Conference Calls and undisclosed information.

[113] Super. Ct. Civ. R. 9(b).
[114] *Mancino v. Webb*, 274 A.2d 711, 713 (Del. Super. 1971).
[115] *See TrueBlue, Inc.*, 2015 WL 5968726, at *6 (quoting *Universal Capital Mgmt., Inc. v. Micco World, Inc.*, C.A. No. N10C-07-039-RRC, 2012 WL 1413598, at *2 (Del. Super. Feb. 1, 2012)).
[116] 2d Am. Compl. ¶ 97.
[117] *Id.*
[118] *Id.*
[119] *Id.* ¶ 98.

Ashland sufficiently pleaded reliance upon April 2011 Conference Calls and the 2005 and 2007 NJDEP Letters. The April 2011 Conference Calls led Ashland to believe that all remedial measures were taken regarding the Linden Property. As such, Ashland agreed to the liability provisions contained in the SPA based on those representations. Further, based on the representations made in the April 2011 Conference Calls, and lack of the hidden documents, Ashland agreed to the liability provision. The 2005 and 2007 NJDEP Letters "would have disclosed material information relating to the environmental condition and status of the [Linden Property] . . . ."[120]

### D. ASHLAND'S FRAUDULENT INDUCEMENT CLAIM, PLEADED IN THE ALTERNATIVE, IS NOT INCONSISTENT WITH THE CONTRACTUAL ALLEGATIONS

Delaware Superior Court Rule 8(e)(2) allows a plaintiff to "set forth two or more statements of a claim or defense alternately or hypothetically, either in one count or defense or in separate counts or defenses. . . . The party may also state as many separate claims or defenses as the party has regardless of consistency. All statement shall be made subject to the obligations set forth in Rule 11."

"A fraud claim can be based on representations found in a contract, however, 'where an action is based entirely on a breach of the terms of a contract between the parties, and not on a violation of an independent duty imposed by law, a plaintiff must sue in contract and not in tort.'"[121] A plaintiff "cannot bootstrap" a claim for a breach of contract into a claim of fraud merely by alleging that a contracting party never intended to perform its obligations" or "simply

---

[120] *Id.* ¶ 204.
[121] *ITW Glob. Investments Inc. v. Am. Indus. Partners Capital Fund IV, L.P.*, 2015 WL 3970908, at *6 (Del. Super. June 24, 2015) (citing *Ameristar Casinos, Inc. v. Resorts Int'l Hldg., LLC*, 2010 WL 1875631, at *11 (Del. Ch. June 24, 2010)).

by adding the term fraudulently induced to a complaint."[122]  Essentially, a fraud claim alleged contemporaneously with a breach of contract claim may survive, so long as the claim is based on conduct that is separate and distinct from the conduct constituting breach."[123]  Allegations that are focused on inducement to contract are 'separate and distinct' conduct."[124]

In this case, Ashland did not explicitly state that their breach of contract and Count III are pleaded in the alternative.  However, Ashland has conceded that they pleaded their breach of contract and fraud claims in the alternative.  Further, Ashland alleges that the Heyman Defendants made false representations or omissions *prior* to entering into the SPA.

E.    DUPLICATIVE DAMAGES

"Delaware courts have consistently held that to successfully plead a fraud claim, the allegedly defrauded plaintiff must have sustained damages as a result of a defendant's [allegedly fraudulent] action. . . . [T]he damages allegations may not simply rehash the damages allegedly caused by the breach of contract."[125]  "Failure to plead separate damages is an independent ground for dismissal."[126]  However, the "mere addition of punitive damages . . . is not enough to distinguish it from the contract damages."[127]

Ashland argues that the damages are distinct.  The damages relating to the breach of contract are based on the loss of bargaining power.  For breach of contract, Ashland seeks declarations that the Heyman Defendants must: (1) conduct all environmental investigation and remediation efforts required by NJDEP at the Property; (2) add themselves or LPH to the ACO;

---

[122] *Furnari,* 2014 WL 1678419, at *8 (quoting *Narrowstep Inc. v. Onstream Media Corp.,* 2010 WL 5422405, at *15 (Del. Ch.2010)).
[123] *Furnari,* 2014 WL 1678419, at *8.
[124] *ITW Glob.,* 2015 WL 3970908, at *6 (quoting *Osram Sylvania Inc. v. Townsend Ventures, LLC,* 2013 WL 6199554, at *16–17 (Del. Ch.2013)).
[125] *Cornell Glasgow, LLC v. La Grange Props. LLC*, 2012 WL 2106945, at *8-9 (Del. Super. June 6, 2012).
[126] *EZLinks Golf, LLC v. PCMS Datafit, Inc.*, 2017 WL 1312209, at *6 (Del. Super. Mar. 13, 2017) *as corrected* (Mar. 1, 2017).
[127] *Id.*

26

(3) request that NJDEP remove IES, ISP, and any other ISP affiliates from the ACO; (4) comply with ISRA; (5) reimburse Ashland for all costs and penalties incurred in connection with the cleanup of the Property; and (6) immediately undertake all environmental investigation and remediation efforts of the Property necessary to comply with the ACO, ISRA, and New Jersey law.

However, the fraud damages are calculated to restore the status quo. Ashland seeks compensatory damages in the amount Ashland expended for investigative and remediation activities at the Property in addition to punitive damages. Ashland concedes that Count III is pleaded in the alternative to the breach of contract claim. Since the claims are pleaded in the alternative, the claims "would never co-exist at final judgment and are, therefore, not duplicative."[128]

In this case, Ashland's damages for breach of contract and fraud appear duplicative. Although claims may co-exist if the damages are distinct in the two counts, here, the fraud damages for the investigative and remediation activities at the Linden Property is subsumed in the breach of contract claim. Further, Ashland does not explicitly seek recession of the contract based on any fraudulent statements or omissions.

However, the breach of contract claim and fraud claim are pleaded in the alternative.[129] Ashland alleges that the Heyman Defendants misled Ashland prior to the execution of the SPA,

---

[128] Opp. at 35.

[129] *Modern Mgt. Co. v. Wilson*, 997 A.2d 37, 44 (D.C. App. 2010) ("Here, Wilson sought alternative recovery under several different statutes for the appellants' conduct, specifically asserting that the transaction was an unconscionable loan or, in the alternative, if the jury decided that the transaction was not a loan, a fraudulent sale. Therefore, the trial court did not err in refusing to require Wilson to elect her remedies prior to trial."); *Countrywide Home Loans, Inc. v. Thitchener*, 192 P.3d 243, 248 (Nev. 2008) ("While plaintiffs are permitted to plead alternative or different theories of relief based on the same facts, plaintiffs may not recover more than their "total loss plus any punitive damages assessed." Here, although the verdict form instructed the jury to 'award the total amount of the Plaintiffs' damages without awarding any duplicative damages' and contained separate categories of damages corresponding to each of the Thitcheners' surviving claims—breach of contract, negligence, trespass, and conversion—the record shows that the jury failed to heed this instruction.").

27

hid information from Ashland, and then sent a misleading document after the execution of the SPA. These allegations go beyond a simple breach of contract claim were the Heyman Defendants did not intend to comply with the terms of the SPA. Therefore, the breach of contract claim and fraud claim are different at this stage in litigation. The Heyman Defendants may later readdress the alternative pleadings.

## VI. CONCLUSION

The Court has been actively involved in this civil action.[130] As presented to date, the Court sees an arms'-length contractual transaction negotiated by sophisticated parties who were represented by attorneys. The Linden Property transaction is not the most material aspect of the SPA.[131] While alleging claims for fraud and unjust enrichment and alike, both parties constantly refer to the SPA to support their claims. The parties, rightfully, rely on the pleading requirements and legal standards of the Superior Court Civil Rules to assert their causes of action. The Court continues to believe, however, that focused discovery on the contractual issues would allow for summary resolution of the claims asserted in this civil action.[132] For the reasons stated above, the Court **DENIES** the Motion.

**IT IS SO ORDERED**

*/s/ Eric M. Davis*
Eric M. Davis, Judge

cc: File&ServeXpress

---

[130] *See Ashland LLC v. The Samuel Heyman 1981 Continuing Trust*, C.A. No. N15C-10-176 EMD CCLD, 2017 WL 1216788 (Del. Super. March 31, 2017); *Ashland LLC v. The Samuel Heyman 1981 Continuing Trust*, C.A. No. N15C-10-176 EMD CCLD, 2017 WL 1224506 (Del. Super. March 30, 2017); *Ashland LLC v. The Samuel Heyman 1981 Continuing Trust*, C.A. No. N15C-10-176 EMD CCLD, 2017 WL 1191099 (Del. Super. March 29, 2017).
[131] Under the SPA, Ashland acquired ISP, IES and Chemco from the Heyman Defendants for **$3.2 billion**. 2d Am. Compl. ¶ 51.
[132] *See, e.g., Ashland LLC*, 2017 WL 1191099, at *6-7.